*Karla Louise Porter v. State of Maryland*, No. 88, September Term, 2016, Opinion by Adkins, J.

**HOMICIDE — IMPERFECT SELF-DEFENSE — MD. CODE (1991, 2013 Repl. Vol.), § 10-916 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE ("CJP") — BATTERED SPOUSE SYNDROME:** A criminal defendant accused of murdering her husband was entitled to a jury instruction on imperfect self-defense when she presented evidence that her husband physically abused her throughout their 24-year marriage, that his abuse had escalated in the weeks preceding his death, and that at the time of his killing she lived in a constant state of fear. Despite the fact that she hired a third-party to carry out the homicide, the defendant presented sufficient evidence that she actually believed she was in "imminent or immediate" danger to receive a jury instruction on imperfect self-defense. Accordingly, the trial court's misstatement of the elements of imperfect self-defense in its jury instruction did not constitute harmless error. We reverse the defendant's convictions and remand for a new trial.

**CONSPIRACY TO COMMIT MURDER — IMPERFECT SELF-DEFENSE:** To convict the defendant of conspiracy to commit murder, the jury must find that she had a malicious intent to kill with premeditation and deliberation. Because imperfect self-defense negates the element of malice, the trial court's misstatement of the law in its imperfect self-defense instruction also infected the jury's verdict as to conspiracy to commit murder.

**SOLICITATION TO COMMIT MURDER — IMPERFECT SELF-DEFENSE:** To be found guilty of solicitation to commit murder, the defendant must have induced a third-party to maliciously kill with premeditation and deliberation. If the jury finds that the defendant acted in imperfect self-defense, it should not find that she solicited another to kill maliciously. Rather, she solicited another to kill for her protection. Accordingly, the erroneous jury instruction as to imperfect self-defense also infected the defendant's solicitation convictions.

Circuit Court for Baltimore County
Case No.: 03-K-10-001690
Argued: May 9, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 88

September Term, 2016

KARLA LOUISE PORTER

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.
Greene, McDonald and Getty, JJ., dissent.

Filed: August 7, 2017

Battered spouse syndrome is a form of posttraumatic stress disorder that develops in victims of intimate partner violence. Maryland law allows a woman on trial for harming her abuser to present evidence explaining battered spouse syndrome and its psychological effects regardless of whether she was the first aggressor, used excessive force, or failed to retreat. Md. Code (1991, 2013 Repl. Vol.), § 10-916(b) of the Courts and Judicial Proceedings Article ("CJP").[1] This case asks us to analyze how Maryland's battered spouse syndrome statute interacts with the elements of imperfect self-defense. It presents the question of whether a defendant who contracted with a third-party to kill her abusive husband can present sufficient evidence that she felt as though she was in imminent danger to be entitled to an imperfect self-defense jury instruction.

## FACTS AND LEGAL PROCEEDINGS

Petitioner Karla Louise Porter met her husband, William Raymond Porter ("Ray"), in 1982. While they were dating, Ray began exhibiting controlling behaviors. He called

---

[1] Maryland Code (1991, 2013 Repl. Vol.), § 10-916(b) of the Courts and Judicial Proceedings Article ("CJP") provides:

> *Admissibility of evidence.* — Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome . . . the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
> (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by [the victim of the defendant's alleged crime]; and
> (2) Expert testimony on the Battered Spouse Syndrome.

Porter at work multiple times a day to make sure she was in her office. He told her that she should spend all of her time maintaining their household or helping him with various tasks. Porter stopped spending time with her friends because Ray "didn't allow it."

After they were married in 1986, Ray began physically and verbally abusing Porter. At trial, Porter testified to numerous instances of violent abuse throughout their 24-year marriage, including that her husband had: beaten her with a belt; hit her with a wooden board; pushed her head into her mother's headstone and told her that she "should be with [her] dead mother"; stabbed a drill into her stomach, leaving a large scar; hit her with a rake; smeared dog excrement across her back; hit her with a toolbox; kicked her in the side; shoved her head into leaking sewage; and given her a black eye. She also testified that on multiple occasions he had: told her that she was "worthless" and "should die"; threatened to kill her; and forced her to drink water until she urinated on herself. Porter testified that she did not call the police or leave Ray after any of these instances of abuse because she was afraid he would retaliate. When asked why she did not move out of their home, she testified, "I knew he would follow me. I knew that there was no getting away."

Porter testified that Ray's physical and verbal abuse escalated in the year preceding his death. During this time, Ray repeatedly expressed a desire to move to Florida. Porter testified, "I felt if I went he was going to kill me there in Florida. I had no family there, no children." She explained that on previous visits to Florida, Ray had threatened to feed her to the alligators. In early 2010, Ray picked up one of his handguns and began yelling about moving to Florida. He told Porter that he did not want to take their children or his parents with them when they moved. He pointed his gun at her head and said, "Maybe I am not

2

even going to take you. I should just kill you now." At the end of February 2010, Ray hit Porter across the back with a crutch because he felt that she did not adequately sympathize with the fact that he was bored. Porter testified that in the weeks leading up to Ray's death she was "terrified almost on a daily basis." She explained that "things were getting so bad, things were just out of control. . . . It was just day-to-day—it wasn't even day-to-day. It was minute-to-minute. Always walking on eggshells."

Beginning in mid-2009, Porter approached multiple people about killing her husband. That summer, she gave her daughter's boyfriend, Daniel Blackwell, $1,000 to "take care of" her husband. The week before Christmas, she asked one of Ray's coworkers, Tony Fails, to kill him. When asked why she solicited Fails to kill Ray, Porter testified, "It was getting so bad that I knew that Ray was going to kill me and I just wanted to kill him first." Neither Blackwell nor Fails took any action against Ray. In January 2010, Porter asked an acquaintance, Paige Huemann, if she knew where she could get some potassium cyanide to poison Ray. Eventually, Porter's nephew, Seamus Coyle, put her in touch with Walter Bishop, who agreed to kill her husband in exchange for $400. As to her mental state on the day her husband was shot, Porter testified, "In my mind, I knew he was going to kill me at any point."

On the morning of Ray's death, March 1, 2010, Porter told him that the alarm had gone off at the gas station that they owned. Ray went to the station, and around 6:30 a.m., Bishop came in and shot Ray twice. Immediately afterwards, Porter called 911 and told the police that the gas station had been robbed and that the thief had shot her husband. About a week later, Porter was arrested for her role in Porter's killing. She admitted to

3

police that she had paid Bishop to "beat [ ] up" her husband. Porter was charged with first-degree murder, conspiracy to commit first-degree murder, three counts of solicitation to commit first-degree murder, and use of a handgun in the commission of a crime of violence.

During the trial, Porter presented two expert witnesses to testify as to her mental state at the time of Ray's killing. Dr. Neal Blumberg, a forensic psychiatrist, testified that he met with Porter on five occasions while she was awaiting trial. He explained that he administered a variety of psychological tests and evaluations, and concluded to a reasonable degree of medical certainty that Porter was suffering from major depressive disorder and posttraumatic stress disorder. Dr. Blumberg testified that Porter "described the relationship with her husband as escalating in a very negative direction," but that "her coping style was not to assert herself or go to the police." He testified, "Her response to that progressive abuse was to cover things over, to deny, to repress, to sort of avoid thinking about what was going on with the hopes that . . . things would settle down . . . ." Due in part to this response, which Dr. Blumberg referred to as "learned helplessness," he concluded to a reasonable degree of medical certainty that Porter was suffering from battered spouse syndrome as defined in CJP § 10-916.

Dr. Mary Ann Dutton, a clinical psychologist, also testified for Porter. Dr. Dutton testified at length about the effects of chronic abuse on an individual's mental state, including describing common reasons women do not leave their abusers. She explained that victims of intimate partner violence often suffer from depression and hyperarousal, or "being on the lookout all the time." Dr. Dutton testified that battered woman syndrome can "augment" a woman's perception of the danger that she faces—it can make it seem

4

more threatening.  Battered women often utilize personal coping mechanisms, such as "trying to keep the peace," Dr. Dutton explained, as opposed to public mechanisms, such as going to the police.  She testified that she met with Porter twice and concluded to a reasonable degree of psychological certainty that Porter "experienced repeated abuse in the context of her marriage" and suffered from psychological effects as a result.  Dr. Dutton also testified that she evaluated Porter's marriage using an instrument developed at Johns Hopkins University to identify relationships in which an abused spouse is in life-threatening danger.  She explained that a number of the risk factors were present in the Porters' relationship, including escalation in the severity of the abuse, frequent use of alcohol, extensive jealousy, and death threats.

Porter also presented lay witness testimony describing Ray's abuse.  Porter's childhood friend, Ray Naimaster, testified that Porter was "standoffish" when he came across her and her husband while they were shopping.  When Naimaster asked her about it later, Porter told him that Ray was jealous.  Naimaster asked Porter if her husband was abusing her, and he testified that she "got small" and "[d]idn't say anything" in response.  Porter's pastor, Johnny Brewer, testified that Porter told him that she was experiencing verbal abuse and that she stopped regularly attending church about two years before her husband's death.  Gertrude Lorraine Briggs, the Porters' co-worker and occasional housekeeper, testified that she observed Ray "be rough" with Porter.  She explained that he would "cut her down and she would start crying."  Briggs testified that Ray's verbal abuse worsened "towards the end when [Porter] said she didn't want to go to Florida."

5

When Briggs suggested to Porter that she leave her husband, Porter told her that Ray would find her.

The Porters' daughter, Megan, also took the stand. She was 18 when her father was killed. She testified that her father often called her mother "a lazy bitch or a fat cunt" and told her "that she was worthless." Megan had seen bruises on her mother's arms and legs, and at one point Megan saw her with a black eye. From her basement bedroom, Megan often overheard yelling and "loud thump[s]" when her father was upset, but she never saw him hit her mother.

At the conclusion of the trial, the State objected to any jury instruction as to self-defense, but then proposed an instruction on imperfect self-defense for the court to use if it decided Porter was entitled to one. The State explained that it added language to the pattern jury instruction on imperfect self-defense because the instruction did not include all of the required self-defense elements.[2] Porter objected to this change. She also

---

[2] The Maryland Criminal Pattern Jury Instructions ("MCJI-Cr"), Section 4:17.2, suggest the following instruction for imperfect self-defense:

> Even if you find that the defendant did not act in complete self-defense, the defendant may still have acted in partial self-defense. [If the defendant actually believed that [he] [she] was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.] [If the defendant used greater force than a reasonable person would have used, but the defendant actually believed that the force used was necessary, the defendant's actual, though unreasonable, belief is a partial self-defense and the

6

requested that the jury be instructed to consider imperfect self-defense as applied to solicitation and conspiracy—not just murder.

The court agreed that the pattern instruction on imperfect self-defense "could be misleading," and read the State's proposed instruction:

> If the Defendant actually believed that she was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, and the Defendant used no more force than was reasonably necessary to defend herself in light of the threatened or actual force, and that retreat from the threat was unsafe, and that she was not the aggressor, the Defendant's actual, though unreasonable belief, is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.

As to Porter's request regarding solicitation and conspiracy, the court found that imperfect self-defense could apply to those crimes. To address this, it told the jury, "Self-defense is a complete defense to the **crimes** charged in this case." (Emphasis added.) The court also instructed the jury, "In assessing the Defendant's claims of self-defense in this case, you may, but are not required to, consider why and how in light of any pattern of abuse that you find existed, the Defendant may have honestly and perhaps reasonably perceived an imminent threat of immediate danger."

During deliberations, the jury submitted a number of questions to the court, including: (1) "Can we see the language of the battered spouse syndrome statute?"; (2) "Clarify definitions of imminent and immediate"; (3) "Do we need all the elements of a crime to be met?"; and (4) "Does mitigating circumstances have to meet all elements of

---

verdict should be guilty of voluntary manslaughter rather than murder.]

7

self-defense or partial self-defense to apply?" The court declined to provide the language of the battered spouse syndrome statute and instructed the jurors to give the words "imminent" and "immediate" "their common and ordinary meaning." The court also reiterated that the "State must prove each of the elements of the offense beyond a reasonable doubt." As to self-defense, it explained that "in order to convict the Defendant of murder, the State must prove that self-defense does not apply in this case. This means that you are required to find the Defendant not guilty unless the State has persuaded you beyond a reasonable doubt that at least one of the four factors of complete self-defense was absent." In response to the last question, the court re-read its original imperfect self-defense instruction.

The jury found Porter guilty of first-degree murder, conspiracy to commit first-degree murder, three counts of solicitation to commit first-degree murder, and use of a handgun in commission of a crime of violence. She was sentenced to life plus 40 years in prison. Porter filed a motion for a new trial, arguing that the jury was not properly instructed "as to the definition of battered spouse syndrome and how to consider this type of evidence in the context of imperfect self[-]defense." The court denied the motion, and Porter appealed.[3]

---

[3] Before the Court of Special Appeals, Petitioner Karla Louise Porter argued that the trial court erred in refusing to voir dire the jury after it submitted a note suggesting it was considering matters not presented at trial. *Porter v. State*, 230 Md. App. 288, 330–31 (2016). She also argued that the trial court erred in denying her motion to suppress the statement she made while in police custody. *Id.* at 333. The intermediate appellate court rejected both of these claims. *Id.* at 332, 343. Neither is before us on appeal.

The Court of Special Appeals held that Porter had not presented sufficient evidence to be entitled to an imperfect self-defense instruction, and thus any error in delivering such an instruction was harmless. *Porter v. State*, 230 Md. App. 288, 327–28 (2016). The intermediate appellate court explained, "There was certainly evidence from which the jury could have found that [ ] Porter had felt herself in imminent danger of death on occasions in the weeks and months before [Ray's] death, but there was no evidence that she had such a belief on the morning of the murder." *Id.* at 327. Thus, the court reasoned, "Porter never [ ] should have received an instruction on self-defense, and cannot now complain that the court's instruction was improper." *Id.* Porter appealed.

We granted *certiorari* to answer the following question:[4]

> Does the trial court's erroneous instruction on imperfect self-defense constitute harmless error?

---

[4] We have rephrased and consolidated the questions presented. In her Petition for Writ of Certiorari, Porter presented the following questions:

1. Did the lower court improperly apply harmless error review when, rather than considering the effect of an erroneous imperfect self[-]defense instruction on the jury's verdict, it applied de novo review to the trial court's underlying decision to grant the instruction—a question not before it— resolved that issue in favor of the State, and retroactively determined that the jury would have convicted if the trial had unfolded as the lower court believed it should have?

2. If so, did the lower court err when it found the provision of legally erroneous instruction on imperfect self[-]defense harmless beyond a reasonable doubt?

3. Was the trial court required to inquire further when a jury note suggested jurors were discussing information they could only have gotten from an outside source?

9

Because we answer no to this question, we reverse the decision of the Court of Special Appeals and remand for a new trial.

## STANDARD OF REVIEW

Porter argues that the trial court's misstatement of the law in its imperfect self-defense jury instruction constitutes reversible error—it was not harmless. "Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal." *Bellamy v. State*, 403 Md. 308, 333 (2008). When we have determined that the trial court erred in a criminal case, "reversal is required unless the error did not influence the verdict." *Id.* at 332 (citation omitted). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Id.* (citation omitted). In other words, reversal is required unless we find that the error was harmless. We have explained that an "error is harmless only if it did not play **any role** in the jury's verdict." *Id.* (emphasis added) (citation omitted). The State carries the burden of proving, beyond a reasonable doubt, that the error meets this high standard. *Dionas v. State*, 436 Md. 97, 108 (2013) (citation omitted).

## DISCUSSION

This case requires us to analyze the relationship between the elements of imperfect self-defense and Maryland's battered spouse syndrome statute to determine: (1) whether Porter was entitled to an instruction as to imperfect self-defense; and (2) if so, whether the misstatement of law within the instruction constitutes reversible error. We begin with the background of these legal concepts.

## The Elements of Self-Defense

In Maryland, we recognize two forms of self-defense: perfect and imperfect. Perfect self-defense requires the following elements:

> (1) The accused must have had reasonable grounds to believe himself in *apparent* imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Smullen*, 380 Md. 233, 252 (2004) (emphasis in original) (citation omitted). To have acted in perfect self-defense, the defendant must have both actually and reasonably believed that he was in imminent or immediate danger at the time he took defensive action. He is also required to have used a reasonable amount of force against his attacker. Additionally, when a defendant uses defensive, deadly force outside of his home, he has a duty "to retreat or avoid danger if such means were within his power and consistent with his safety." *Burch v. State*, 346 Md. 253, 283 (1997) (citation omitted). Perfect self-defense is a complete defense to murder, and thus, "if credited by the trier of fact, results in an acquittal." *Smullen*, 380 Md. at 251.

Imperfect self-defense, on the other hand, does not require the defendant to demonstrate that he had reasonable grounds to believe that he was in imminent danger. Rather, he must only show that he **actually believed** that he was in danger, even if that belief was unreasonable. *Smullen*, 380 Md. at 252 (quoting *State v. Marr*, 362 Md. 467,

11

473 (2001)). Additionally, to assert imperfect self-defense, the defendant is not required to show that he used a reasonable amount of force against his attacker—only that he **actually believed** the amount of force used was necessary. *Id.* Lastly, to have acted in imperfect self-defense, a defendant must have only "subjectively believe[d] that retreat was not safe"—that belief need not be reasonable. *Burch*, 346 Md. at 284. In *State v. Faulkner*, 301 Md. 482 (1984), we explained the legal theory supporting the imperfect self-defense doctrine. We reasoned that a defendant's actual, though unreasonable, belief that he is in imminent danger "negates the presence of malice, a prerequisite to a finding of murder." *Id.* at 500–01. But, we continued, "the defendant is nevertheless to blame for the homicide and should not be rewarded for his unreasonable conduct." *Id.*

In sum, when a defendant accused of murder presents evidence of self-defense, a proper instruction enables the jury to reach one of three verdicts: (1) guilty of murder, if the jury concludes that "the defendant did not have a subjective belief that the use of deadly force was necessary;" (2) not guilty, if the jury concludes "that the defendant had a reasonable subjective belief;" and (3) guilty of voluntary manslaughter, if the jury concludes "that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances." *Id.* To prove that the defendant is guilty of murder beyond a reasonable doubt, the State carries the burden of showing that he **did not** act in perfect or imperfect self-defense. *Dykes v. State*, 319 Md. 206, 217 (1990).

**Battered Spouse Syndrome**

Just under one in four women in the United States will experience severe physical violence at the hands of an intimate partner during their lifetimes. Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention, The National Intimate Partner and Sexual Violence Survey: 2010 Summary Report 2 (2011), https://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf [https://perma.cc/W76G-BE3G]. The vast majority of intimate partner violence—82 percent—is committed against women. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 244697, Nonfatal Domestic Violence, 2003-2012, at 6 (2014), https://www.bjs.gov/content/pub/pdf/ndv0312.pdf [https://perma.cc/5MEB-LS9M]. Out of all female homicide victims, about 40 percent are killed by an intimate partner. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 236018, Homicide Trends in the United States, 1980-2008, at 18 (2011), https://www.bjs.gov/content/pub/pdf/htus8008.pdf [https://perma.cc/YM96-JNL9].

The psychological impact of repeated intimate partner violence is referred to as battered spouse syndrome. Lenore E.A. Walker, *Battered Women Syndrome and Self-Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 327 (1992). Battered spouse syndrome was first recognized by Dr. Lenore Walker, an academic and clinical psychologist. *See* Lenore E. Walker, *The Battered Woman* (1979); Lenore E. Walker, *The Battered Woman Syndrome* (1984). She has explained that the syndrome is a form of posttraumatic stress disorder, and, accordingly, women in abusive relationships "respond to the repeated abuse in a manner similar to others who have been repeatedly exposed to

13

different kinds of trauma." Walker, *Self-Defense*, *supra*, at 326. They often experience cognitive confusion, high anxiety, and depression. *Id.* at 327–28.

Battered spouse syndrome is characterized by two main phenomena: a cycle of intimate partner violence and the development of "learned helplessness." *Id.* at 330. In her study of abusive relationships, Dr. Walker discovered three phases in the "cycle of violence": (1) "the period of tension-building"; (2) "the acute battering incident"; and (3) "the period of loving-contrition or absence of tension." *Id.* (emphasis omitted). She explained that in cases where the abuse "has reached dangerous proportions," the third phase "is not readily visible, and although there is some lessening of the tension, the woman never feels out of danger." *Id.* The second phenomena, learned helplessness, occurs when "the victim learns that when she attempts to defend herself—by reaching out to others or trying to leave—that she will be the victim of more severe violence." *Smullen*, 380 Md. at 254 (quoting Erin Masson, *Admissibility of Expert or Opinion Evidence of Battered-Woman Syndrome on Issue of Self-Defense*, 58 A.L.R. 5th 749, 762–63 (1998)). In response, she determines "that the most effective short-term method of reducing incidents of violence is to be more subservient." *Id.*

When a woman uses physical force to defend against her abuser, expert witness testimony explaining the effects of battered spouse syndrome can be crucial to a successful self-defense claim. In *Smullen*, the Court explained why such testimony is relevant to an assertion of self-defense. This testimony "offers an explanation of why the defendant, having been previously subjected to abuse, simply did not leave the home or take some other action against her abuser." *Id.* at 254–55. It also helps explain to the jury "why,

14

though *apparently* the aggressor, the defendant was actually responding to a perceived aggression by the victim." *Id.* at 271 (emphasis in original). In an abusive relationship, we explained, "the victim becomes able to sense the escalation in the frequency and intensity of the violence and thus becomes more sensitive to the abuser's behavior." *Id.* at 255. Thus, we continued, she "is in a position to know, perhaps with greater certainty than someone attacked by a stranger, that the batterer's threat is real and will be acted upon." *Id.* (citation omitted). She is able to "recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence." *Id*. at 270–71.

In 1991, the General Assembly enacted a statute defining battered spouse syndrome as "the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant." CJP § 10-916(a)(2); 1991 Md. Laws ch. 337. The statute allows a defendant who suffered from battered spouse syndrome at the time of the offense to offer evidence of the abuse and expert testimony on the syndrome "[n]otwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense." *Id.* § 10-916(b). According to the Senate Judicial Proceedings Committee Floor Report, the intent of the statute was to "clarify that the court has discretion to admit evidence of repeated physical and psychological abuse of the defendant by the alleged victim and expert testimony on the battered spouse syndrome." S. Judicial Proceedings Comm., Floor Report on House Bill 49, 401st Sess. (Md. 1991).

With this background in mind, we turn to the merits of Porter's claim.

**Analysis**

The State concedes that the trial judge gave an erroneous jury instruction on imperfect self-defense. The court misstated the law regarding the use of force—it instructed the jury that to find that Porter acted in imperfect self-defense, she must have "used no more force than was reasonably necessary to defend herself." But imperfect self-defense only requires that the defendant actually believed that the force used was necessary—not that the force used was objectively reasonable. *Smullen*, 380 Md. at 252 (citation omitted). The court's instruction also implied that the jury should objectively evaluate whether Porter could safely retreat. It told that jury to only find imperfect self-defense if "retreat from the threat was unsafe." We seek to determine whether these errors were harmless.

Porter argues that the erroneous imperfect self-defense instruction affected the verdict, and thus constitutes reversible error. She claims that she presented ample evidence that she lived in a constant state of fear of imminent danger at the hands of Ray in the weeks leading up to his death, including the morning he was killed. Accordingly, she argues, she was entitled to a correct jury instruction as to imperfect self-defense. The State responds that Porter did not demonstrate that she actually believed that she was in imminent or immediate danger at the time Ray was killed, and therefore was not entitled to an imperfect self-defense jury instruction. Because the instruction was superfluous, the State argues, any error within it was harmless. We agree with Porter.

We have previously held that error within an unnecessary jury instruction does not constitute reversible error. *See Fowler v. State*, 237 Md. 508, 513 (1965) (holding that an

16

erroneous insanity jury instruction was not reversible error because the defendant was not entitled to the instruction). The Court of Special Appeals has explained, "When a defendant has [ ] no right even to take an issue before the jury, any instruction on such an issue (erroneous or not) is more than he is entitled to." *Evans v. State*, 28 Md. App. 640, 668 (1975), *aff'd*, 278 Md. 197 (1976). Accordingly, we begin by addressing the State's contention that Porter was not entitled to a jury instruction on imperfect self-defense.

In Maryland, the defendant has the "burden of initially producing 'some evidence' on the issue of mitigation or self-defense." *Wilson v. State*, 422 Md. 533, 541 (2011) (citation omitted). Once the issue has been generated by the evidence, the defendant is entitled to a jury instruction explaining the elements of perfect or imperfect self-defense. *Dykes*, 319 Md. at 215–16. The Court fleshed out the meaning of "some evidence" in *Dykes*, in which we explained that this standard "calls for no more than what it says— 'some,' as that word is understood in common, everyday usage." *Id.* at 216–17. We continued, "It need not rise to the level of 'beyond reasonable doubt' or 'clear and convincing' or 'preponderance.'" *Id.* at 217. Furthermore, it does not matter if the evidence of self-defense "emanate[s] solely from the defendant" or is "overwhelmed by evidence to the contrary." *Id.* The defendant's burden is minimal—"[i]f there is **any evidence** relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden." *Id.* (emphasis added).

To determine whether Porter has presented "some evidence" that she acted in imperfect self-defense, we examine the meaning of "imminent or immediate" and the rationale supporting this element of self-defense within the context of Maryland's battered

spouse syndrome statute. We also address whether imminence can ever be demonstrated when a woman hires a third party to kill her abuser.

*The Meaning of "Imminent" and "Immediate"*

The parties' disagreement centers on the meaning of "imminent or immediate danger" as used in the imperfect self-defense jury instruction. Porter argues that the evidence she presented demonstrating that "the threat of violence hung in the air at all times" satisfies the "imminent or immediate" requirement. The State urges us to apply the dictionary definitions of these terms. Citing Webster's, it contends that "imminent" means "[a]bout to occur at any moment" or "impending," and that "immediate" means "[o]f or near the present time." Maryland courts have not yet defined "imminent" or "immediate," but courts around the country have grappled with the meaning of these words.

In *State v. Hundley*, 693 P.2d 475 (Kan. 1985)—a case in which a woman killed her abusive husband—the Kansas Supreme Court held that the use of the word "immediate" in the perfect self-defense jury instruction, instead of the word "imminent," as required by the applicable statute, constituted reversible error. *Id.* at 477, 480. The defendant had left her abusive husband and was living in a motel room at the time of the killing. One night, after her husband broke into her motel room, repeatedly threatened to kill her, and raped her, the defendant shot him twice in the back. *Id.* at 476. The court explained that the use of the word "immediate" "places undue emphasis on the immediate action of the deceased, and obliterates the nature of the buildup of terror and fear which had been systematically created over a long period of time." *Id.* at 479. The court reasoned that the word

18

"imminent" reflects an apprehension of danger, and is thus more accurate in the self-defense context. *Id.* It explained:

> An aggressor who is customarily armed and gets involved in a fight may present an imminent danger, justifying the use of force in self-defense, even though the aggressor is unarmed on the occasion. There may be no immediate danger, since the aggressor is in fact unarmed, but there is a reasonable apprehension of danger.

*Id.*

The Washington Supreme Court has similarly explained that "imminent" has less to do with proximity in time than "immediate." *State v. Janes*, 850 P.2d 495, 506 (Wash. 1993). The court explained that "imminent" is defined, in part, as "hanging threateningly over one's head" or "menacingly near." *Id.* (quoting *Webster's Third New International Dictionary* 1130 (1976)). Accordingly, it reasoned, even a threat that "occurred days before the homicide" could support a defendant's claim that she feared "imminent" harm "when the evidence shows that such a comment inevitably signaled the beginning of an abusive episode." *Id.*

One justification for broadening the meaning of "imminence" in the self-defense context is explained by Professor Robinson with the following hypothetical:

> Suppose *A* kidnaps and confines *D* with the announced intention of killing him one week later. *D* has an opportunity to kill *A* and escape each morning as *A* brings him his daily ration. Taken literally, the *imminent* requirement would prevent *D* from using deadly force in self-defense until *A* is standing over him with a knife, but that outcome seems inappropriate.

19

2 Paul H. Robinson, *Criminal Law Defenses* § 131(c)(1) (1984) (emphasis in original) (footnote omitted). As opposed to asking whether the threat was immediate, Professor Robinson explains, the proper inquiry is "the immediacy of the response necessary in defense." *Id.* He continues, "If a threatened harm is such that it cannot be avoided if the intended victim waits until the last moment, the principle of self-defense must permit him to act earlier—as early as is required to defend himself effectively." *Id.* As another legal scholar has explained, "The requirement of imminence means that the time for defense is now. The defender cannot wait any longer." George P. Fletcher, *Domination in the Theory of Justification and Excuse*, 57 U. Pitt. L. Rev. 553, 556 (1996).

The Court of Special Appeals applied a similar interpretation of "imminence" in *State v. Peterson*, 158 Md. App. 558 (2004), a post-conviction appeal. The intermediate appellate court held that a defendant who shot her abusive husband while he was watching television was entitled to a new trial because her counsel failed to present evidence of battered spouse syndrome. *Id.* at 597. The court explained that "the evidence available to the defense at trial was sufficient to draw a picture of years of repeated abuse that occurred in cycles," and that in the months before the killing, the defendant was subject to at least one instance of physical abuse, daily death threats, and a rape threat. *Id.* at 592–93. It reasoned that this evidence, along with testimony that the defendant yelled "[Y]ou're not going to kill me!" when she shot her husband, supports "a strong inference that the appellee was in fear of imminent harm" at the time of the killing. *Id.* at 592. The court distinguished *Peterson* from *Smullen*, in which we held that the defendant had not presented sufficient evidence that he feared imminent harm at the hands of his abusive father. *Id.* at 593. It

20

explained that, unlike *Smullen*, "there was ample evidence from sources other than the [defendant], including the couple's children, to show that for years the [defendant] suffered physical and psychological abuse by [her husband]." *Id.* The court concluded that if defense counsel had presented evidence of battered spouse syndrome, "the defense of imperfect self-defense would have been generated." *Id.* at 597.

Other jurisdictions have implicitly broadened the meaning of imminence by allowing a defendant to assert self-defense after she had killed her husband in a non-confrontational situation—when her husband was not presently attacking her.[5] In *State v. Gallegos*, 719 P.2d 1268 (N.M. App. 1986), the New Mexico Court of Appeals held that a woman who shot and stabbed her abusive husband while he was lying in bed had presented "substantial evidence of imminent danger" and was therefore entitled to a self-defense jury instruction. *Id.* at 1273. On the day of the killing, the defendant's husband had raped her, threatened to kill her, and hit their son with a belt. That evening, after her husband called her into the bedroom, the defendant shot him with a rifle and then stabbed him in the neck multiple times. *Id.* at 1269, 1272. The defendant testified that at the time of the killing she "feared for her life." *Id.* at 1272. The court rejected the trial court's conclusion that "absent an obvious threat at the time of the slaying, past violent conduct could not provide the foundation for a self-defense instruction." *Id.* at 1269. The court explained, "To require the battered person to await a blatant, deadly assault before she can act in defense of herself

---

[5] But see, *e.g.*, *State v. Stewart*, 763 P.2d 572, 578 (Kan. 1988) (woman who killed her abusive husband while he was sleeping did not show that she was in imminent danger at the time of the killing); *State v. Norman*, 378 S.E.2d 8, 12 (N.C. 1989) (same); *Commonwealth v. Grove*, 526 A.2d 369, 373 (Pa. Super. Ct. 1987) (same).

would not only ignore unpleasant reality, but would amount to sentencing her to 'murder by installment.'" *Id.* at 1271 (quoting Loraine Patricia Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed*, 32 Hastings L.J. 895, 928 (1981)).

In *State v. Allery*, 682 P.2d 312 (Wash. 1984), the Washington Supreme Court held that evidence of battered spouse syndrome was admissible to show the defendant's fear of "imminent danger" when she killed her husband while he was lying on the couch. *Id.* at 316. Due to severe physical abuse, including multiple pistol whippings and assaults with a knife, the defendant had a restraining order against her husband. *Id.* at 313. On the night of the killing, she came home to find him lying on her couch. He said to her, "I guess I'm just going to have to kill you sonofabitch. Did you hear me that time?" *Id.* The defendant went into the bedroom and tried unsuccessfully to escape through the window. She thought she heard her husband getting a knife from the kitchen, loaded a shotgun, and shot him while he was still on the couch. *Id.* at 314. Explaining that the defendant had presented sufficient evidence that she believed her husband posed imminent danger, the court held that evidence regarding battered spouse syndrome was admissible to help the jury evaluate her self-defense claim. The court reasoned, "To effectively present the situation as perceived by the defendant . . . the defense has the option to explain her feelings to enable the jury to overcome stereotyped impressions about women who remain in abusive relationships." *Id.* at 316; *see also State v. Hennum*, 441 N.W.2d 793, 796–99 (Minn. 1989) (holding expert testimony explaining battered spouse syndrome admissible when defendant shot her abusive husband while he was sleeping); *State v. Leidholm*, 334 N.W.2d

22

811, 818–19 (N.D. 1983) (remanding for new trial due to error in self-defense jury instruction when defendant stabbed her abusive husband while he was sleeping).

The elements of imperfect self-defense require Porter to demonstrate that she actually feared "imminent **or** immediate" danger—not both.[6] *See Smullen*, 380 Md. at 252 (emphasis added). We find the temporal distinction between imminent and immediate persuasive—an imminent threat is not dependent on its temporal proximity to the defensive act. Rather, it is one that places the defendant in imminent fear for her life. Additionally, "to determine the meaning of a term in the context of a non-legislative jury instruction, we import and apply common and well-established principles of statutory interpretation," including an aim "to ensure that no word . . . is rendered surplusage." *Preston v. State*, 444 Md. 67, 83–84 (2015) (citation omitted). This interpretation avoids rendering either "imminent" or "immediate" redundant—they each carry their own meaning.

Furthermore, distinguishing between "imminent" and "immediate" gives full effect to the General Assembly's intent in passing the battered spouse syndrome statute. The statute allows a defendant to present evidence regarding her abuse "[n]otwithstanding evidence that [she] was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense." CJP § 10-916(b). In permitting the admission of evidence of the victim's past abuse and the effects of battered spouse syndrome, the General Assembly

---

[6] Although the MPJI-Cr use the phrase "imminent **and** immediate," this is a misstatement of the law. MPJI-Cr 4:17.2 (emphasis added). We have repeatedly stated that to demonstrate perfect or imperfect self-defense, a defendant must show that she actually believed that she was in either "imminent **or** immediate danger." *See, e.g.*, *State v. Smullen*, 380 Md. 233, 252 (2004) (emphasis added); *State v. Marr*, 362 Md. 467, 473 (2001) (citation omitted); *State v. Faulkner*, 301 Md. 482, 485 (1984).

23

must have contemplated that such evidence would be material—immaterial evidence is not admissible. Md. Rule 5-402; *see State v. Enriquez*, 327 Md. 365, 373 (1992) (noting that in conducting statutory interpretation, "the legislature is presumed to know the law"). Indeed, the Senate Judicial Proceedings Committee Floor Report states that the bill "would establish" that evidence regarding the decedent's abuse and battered spouse syndrome is "relevant to the defendant's motive or state of mind." S. Judicial Proceedings Comm., Floor Report, *supra*, at 2. If we were to hold that a battered spouse who kills in a non-confrontational setting is not entitled to a self-defense instruction, we would render all or some of the evidence admissible under the battered spouse syndrome statute irrelevant. Without a jury instruction as to self-defense, the admission of evidence regarding battered spouse syndrome and the victim's abuse would be pointless.

Evidence admitted under the battered spouse syndrome statute can be essential to a defendant's claim of imperfect self-defense when she has committed non-confrontational homicide. Expert testimony regarding the cycle of violence in an abusive relationship can explain to the jury how a woman might **actually** fear imminent danger during a break between violent episodes. As legal scholars have explained, a woman who kills her abuser outside of a direct confrontation "experiences the growing tension of phase one, develops a fear of death or serious bodily harm during [the physical abuse of] phase two, and, perceiving that she will be unable to defend herself when the next attack comes, finally 'defends' herself at her only opportunity, [ ] during a lull in the violence," or phase three. David L. Faigman & Amy J. Wright, *The Battered Woman Syndrome in the Age of Science*, 39 Ariz. L. Rev. 67, 73 (1997) (footnotes omitted). The Supreme Court of South Carolina

24

has explained that "battered women can experience a heightened sense of imminent danger arising from the perpetual terror of physical and mental abuse. Often the terror does not wane, even when the batterer is absent or asleep." *Robinson v. State*, 417 S.E.2d 88, 91 (S.C. 1992) (citation omitted). The General Assembly signaled recognition of this fact by allowing expert testimony regarding battered spouse syndrome—including the effects of the cycle of violence on a woman's mental state—even when the woman appears to be the first aggressor.

The State argues that the battered spouse syndrome statute "does not stretch the contours of self-defense doctrine to allow a battered spouse to kill anytime, anywhere because she believes death at her partner's hands is inevitable." We agree in part—a woman who acts in imperfect self-defense is certainly not **allowed** to kill her abusive husband. The doctrine of imperfect self-defense permits her to make her case to the jury that she only committed manslaughter—not that she deserves acquittal.

*The Purpose of the "Imminent or Immediate" Requirement*

To determine whether allowing Porter to assert imperfect self-defense strays from the reasoning behind the doctrine, we next analyze the purpose of the "imminent or immediate" danger requirement. Two rationales are commonly asserted to support limiting self-defense to threats of "imminent or immediate" danger: (1) a non-imminent threat may never come to fruition; and (2) there are other ways to address a non-imminent threat besides responding with defensive force. Kit Kinports, *The Myth of Battered Woman Syndrome*, 24 Temp. Pol. & C.R. L. Rev. 313, 315 (2015) (footnotes omitted); *see* Wayne R. LaFave, *Criminal Law* § 10.4(d) (5th ed. 2010). The reality of abusive relationships,

25

however, shows that allowing a claim of self-defense when a battered woman kills in a non-confrontational situation does not undermine these rationales.

Porter presented extensive evidence during her trial that the violence she feared would in fact come to fruition. Research has shown that men who physically abuse their partners are likely to do it again. *See, e.g.*, Kit Kinports, *Defending Battered Women's Self-Defense Claims*, 67 Or. L. Rev. 393, 425 n.133 (1988) (collecting psychological literature expressing doubt that an abusive husband will ever stop the abuse). Almost 80 percent of women who experience intimate partner violence have been previously abused by the same perpetrator. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 239203, Intimate Partner Violence, 1993-2010, at 4 (2012), https://www.bjs.gov/content/pub/pdf/ipv9310.pdf [https://perma.cc/4CSM-4X32]. Additionally, studies reveal that a woman's perception of danger from her abuser is the "single best predictor of re-assault." Janice Roehl et al., *Intimate Partner Violence Risk Assessment Validation Study, Final Report* 14 (2005) (citation omitted).

Moreover, battered spouse syndrome is defined, in part, by the repetition of the cycle of violence. In *Smullen*, we explained that the "essence of the syndrome is that this cycle repeats." 380 Md. at 254. We continued, "Worse, perhaps, than the mere repetition, is the fact that, over time, the cycle becomes more intense, more frequent, more violent, and often more lethal." *Id.* Here, Porter and Dr. Dutton both testified to the escalation of violence in the Porters' marriage. Dr. Blumberg testified that Porter suffered from battered spouse syndrome, which was caused by a cycle of violence that repeated throughout her 28-year-long relationship with Ray. Thus, this rationale for the "imminent or immediate"

26

requirement cannot support a rejection of Porter's argument. In a cyclical, abusive relationship the threated violence **will** come to fruition—it is often only a matter of when.

The second justification for requiring defendants to face "imminent or immediate" danger before responding with force—that there are other options until that point—also does not support the State's argument that Porter is not entitled to an imperfect self-defense instruction. As we explained in *Smullen*, expert testimony regarding battered spouse syndrome helps the jury evaluate whether the defendant could have safely retreated by describing "why the defendant, having been previously subjected to abuse, simply did not leave the home or take some other action against her abuser." *Id.* at 255. Holding that Porter has not put forth evidence that she believed she was in "imminent or immediate danger" because she had time to pursue other options to avoid the abuse would contradict our explanation of battered spouse syndrome. We admit expert testimony as to battered spouse syndrome in part to thwart the assumption that if the relationship was truly abusive, the woman would have left or sought help from law enforcement.[7] Indeed, the expert witnesses in this case provided the jury with information as to why Porter did not pursue other avenues of escape. Admitting this testimony but then denying the self-defense instruction because the threat was not "imminent," *i.e.*, she had time to escape, is illogical

---

[7] One-third of victims of serious intimate partner violence—defined as rape, sexual assault, robbery, or aggravated assault—who do not report the abuse to police cite "fear of reprisal" as a reason. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 250231, Police Response to Domestic Violence, 2006-2015, at 3 tbl. 3 (2017), https://www.bjs.gov/content/pub/pdf/prdv0615.pdf [https://perma.cc/NYA2-7KXB]. Of all incidents of serious intimate partner violence reported to police between 2006 and 2015, only 26 percent of initial police responses included arresting the perpetrator. *Id.* at 6 tbl. 7.

and unjust. *See* V.F. Nourse, *Self-Defense and Subjectivity*, 68 U. Chi. L. Rev. 1235, 1268, 1280–91 (2001) (explaining how the imminence requirement often serves as a proxy for retreat).

In allowing Porter to assert imperfect self-defense in this case, we do not stray from the purpose of the "imminent or immediate" danger requirement. Although our holding admittedly takes a step further than other courts have traveled, we decline to hold that a woman suffering from battered spouse syndrome must experience abuse within minutes or hours of her defensive action to be entitled to an instruction on imperfect self-defense. Doing so would ignore the reality of intimate partner violence.

*Contract Killings*

The State argues that self-defense—perfect or imperfect—is not available to defendants who hire a third party to take action against their abusers.[8] *Porter*, 230 Md. App. at 320–21. It claims that the "battered spouse syndrome statute does not so alter the elements of self-defense as to mitigate a contract murder where the contract for the murder involved intricate planning that began several weeks before." We disagree. Imperfect self-defense negates the element of malice, not premeditation. *Faulkner*, 301 Md. at 500–01. A woman claiming imperfect self-defense must present evidence that she feared imminent or immediate danger at the time of the killing—she does not have to show that she acted spontaneously. The means by which a woman takes defensive action against her abuser

_____

[8] The State claims that although it made this argument before the Court of Special Appeals, it does not assert it before this Court. It then goes on, however, to defend its position on this point. Thus, we address this issue.

28

does not affect whether she actually believed she was in imminent danger at the time of the killing. A woman who recruits help in taking defensive action does not forfeit her right to claim imperfect self-defense by doing so.

We acknowledge that three other jurisdictions faced with this question have declined to allow a self-defense jury instruction when a woman hires a third party to kill her abusive partner. *See People v. Yaklich*, 833 P.2d 758, 763 (Colo. App. 1991) (holding that woman who hired third party to murder her abusive husband had not shown she was in imminent danger at time of killing); *State v. Anderson*, 785 S.W.2d 596, 600 (Mo. Ct. App. 1990) (holding that court did not err in excluding battered spouse syndrome testimony when woman hired third party to kill her husband because she did not make a prima facie showing of self-defense); *State v. Martin*, 666 S.W.2d 895, 899 (Mo. Ct. App. 1984) (holding that court did not err in concluding that defendant who hired third party to kill her husband had not made out elements of self-defense); *State v. Leaphart*, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983) (holding that court did not err in concluding that woman who hired third party to kill her abusive husband was not entitled to self-defense instruction because she had not demonstrated that she was in imminent danger at the time of the killing). But just one of these cases involved a battered spouse syndrome statute, and that statute only admitted evidence regarding the syndrome to support claims of **perfect** self-defense. *Anderson*, 785 S.W.2d at 599, 600; *see State v. Beeler*, 12 S.W.3d 294, 298 (Mo. 2000) (explaining that Missouri statutory law refers to imperfect self-defense as "recklessness"); Mo. Rev. Stat. § 563.031 (1977) (defining self-defense with objective

29

standard). Moreover, we disagree with these decisions because we see no principled reason to distinguish contract killings from other forms of non-confrontational defensive action.

The Dissent claims that "Porter's planning of her husband's demise dispels the notion that she was in the sort of imminent danger of serious bodily harm that justifies the use of deadly force." Dissent Slip Op. at 12. This view flatly ignores the nature of battered spouse syndrome. A woman suffering from the syndrome has endured more than one round of the cycle of violence—it is unsurprising that she may take steps to defend herself in preparation for the next bout of abuse. *See Smullen*, 380 Md. at 254 (explaining that battered spouse syndrome does not exist unless the cycle of violence has repeated at least once); Faigman & Wright, *supra*, at 73 (footnotes omitted).

Furthermore, the Dissent's claim perpetuates a dangerous myth about intimate partner violence. By holding Porter's forethought against her, the Dissent takes the position that a woman who plans defensive action can never fear imminent harm. It suggests that a woman living in such constant fear would pursue other avenues of escape, such as calling the police. Dissent Slip Op. at 10–11. But only about half of nonfatal instances of intimate partner violence are reported to police, in part because women fear reprisal or believe the police will be unable to help them. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 250231, Police Response to Domestic Violence, 2006-2015, at 2 tbl. 1, 3 tbl. 3 (2017), https://www.bjs.gov/content/pub/pdf/prdv0615.pdf [https://perma.cc/NYA2-7KXB]. The battered spouse syndrome statute allows the admission of expert testimony regarding the syndrome in large part to dispel myths such as this one. Indeed, Dr. Dutton took the stand to explain why a woman suffering abuse

30

would choose to stay in the relationship as opposed to leaving or seeking help from authorities. Denying imperfect self-defense to women who kill their batterers in non-confrontational settings—or when they have had time to plan—undermines the battered spouse syndrome statute, which explicitly permits testimony regarding the abuse despite evidence that the woman was the first aggressor. *See* CJP § 10-916(b).

Additionally, the Dissent would require a contemporaneous threat at the time a woman takes defensive action for her to generate the issue of imperfect self-defense. Dissent Slip Op. at 4. But this blurs the concepts of perfect and imperfect self-defense. The Dissent seems to argue that it would be unreasonable for a defendant to fear imminent harm in the absence of a contemporaneous threat, but Porter does not claim her fear was reasonable. Porter argues that she is entitled to an instruction on imperfect self-defense because she has presented evidence that she **actually believed** she was in imminent danger. Whether that belief was reasonable is irrelevant.

*"Some Evidence"*

The State argues that despite Ray's history of abuse, Porter has not presented evidence that she feared imminent danger at the precise moment Ray was killed. It points to *State v. Martin*, 329 Md. 351 (1993), in which the Court explained that because "it is the defendant's subjective belief at the moment that the fatal shot is fired that is relevant and probative, evidence of a prior mental state will not suffice" to support an imperfect self-

31

defense jury instruction. *Id.* at 365. Thus, it contends, Porter's testimony does not suffice here. We disagree.

Porter has put forth at least "some evidence" that on the morning Ray was shot, she feared imminent harm at the hands of her husband. She testified that his physical and verbal abuse had escalated and that, in the month before his death, he threatened to kill her at gunpoint. She explained that in the weeks leading up to Ray's death, she felt as if she was "[a]lways walking on eggshells" for fear Ray would harm her. Porter's description of the abuse was corroborated by several lay witnesses. Her testimony was further bolstered by two experts who described the effects of Ray's abuse on Porter's mental state. Dr. Dutton opined that Ray's repeated abuse could have heightened Porter's perception of danger. Unlike the defendant in *Martin*, who testified that he could not remember taking defensive action because he was intoxicated, Porter testified as to her mental state on the morning of Ray's death. She explained, "In my mind I knew he was going to kill me at any point." We also keep in mind that Porter asserted imperfect self-defense, which does not require her belief that she was in imminent danger to be reasonable. We hold that she has certainly presented "some evidence" that she actually believed that she was in imminent danger at the time Walter Bishop killed her husband. It is up to the jury to decide whether to believe her.

Furthermore, the misstatement of the law in the imperfect self-defense instruction was not otherwise harmless error. Porter's assertion that she killed her husband in self-defense was the heart of her case. During opening argument, Porter's counsel described the elements of both perfect and imperfect self-defense. She called a number of witnesses

32

to testify about Ray's abuse and its psychological effects. Porter told the jury, "It was getting so bad that I knew that Ray was going to kill me and I just wanted to kill him first." In closing argument, defense counsel reiterated that at the time of Ray's killing, Porter "subjectively, in her mind, felt that her death or severe bodily injury was imminent."

Additionally, during deliberations, the jury asked about the definition of "imminent" and "immediate" and requested to see the battered spouse syndrome statute, both of which show it was considering Porter's self-defense claim. *See Dionas v. State*, 436 Md. 97, 110–11 (2013) (explaining that jury notes are relevant to a harmless error analysis because they can reveal "the jury's perspective as the arbiters of fact"). The court's instruction that, to prove partial self-defense, Porter must show that she "used no more force than was reasonably necessary" and "that retreat from the threat was unsafe" incorrectly directed the jury to evaluate her conduct against an objective standard. It misstated the key difference between perfect and imperfect self-defense: the shift from an objective standard to a subjective one. In light of the severity of this error, we cannot say beyond a reasonable doubt that the erroneous instruction did not affect the verdict.

Because we vacate Porter's first-degree murder conviction—the only crime of violence she was charged with—we also vacate her conviction for use of a handgun in the commission of a crime of violence. *See* Md. Code (1957, 2012 Repl. Vol.), § 14-101(a) of the Criminal Law Article (defining crimes of violence); *Wilson v. State*, 28 Md. App. 168, 178 (1975) (vacating conviction for use of a handgun in the commission of a crime of violence after murder conviction was vacated).

33

*The Inchoate Offenses*

The State argues that even if we find that the court committed reversible error as to the imperfect self-defense instruction, we should still affirm Porter's conspiracy and solicitation convictions. We disagree.

To be found guilty of conspiracy, the defendant "must have a specific intent to commit the offense which is the object of the conspiracy." *Alston v. State*, 414 Md. 92, 114–15 (2010). Accordingly, conspiracy to commit murder requires "a malicious intent to kill with deliberation and premeditation." *Id*. at 117. We have acknowledged that imperfect self-defense negates the element of malice in homicide offenses and their inchoate forms. *Christian v. State*, 405 Md. 306, 327 (2008) (citation omitted). Thus, without malice aforethought, Porter could not have conspired to commit murder. On remand, if the jury finds that Porter actually believed that her life was in imminent danger at the time she conspired to have Ray killed, she cannot be found guilty of conspiracy to commit murder. Accordingly, the conspiracy charge against her must also be re-tried.

As to solicitation, the "gist of the crime is counselling, enticing or inducing another to commit a crime." *Denicolis v. State*, 378 Md. 646, 659 (2003) (citation and internal quotation marks omitted). Like conspiracy, solicitation is a specific intent crime—the defendant must have intended for the solicited person to achieve the prohibited result. LaFave, *supra*, at § 11.1(c). Professor LaFave explains that "where the prohibited result involves special circumstances as to which a *mens rea* requirement is imposed, the solicitor cannot be said to have intended that result unless he personally had this added mental state." *Id*. Therefore, as the North Carolina Court of Appeals explained, to hold a defendant liable

34

for solicitation to commit murder, "the State must prove that [the] defendant counseled, enticed, or induced another to commit each of the following: (1) an unlawful killing; (2) with malice; (3) with the specific intent to kill formed after some measure of premeditation and deliberation." *State v. Crowe*, 656 S.E.2d 688, 692 (N.C. Ct. App. 2008) (citation and internal quotation marks omitted). If the jury finds that Porter feared imminent danger at the time she solicited Daniel Blackwell, Tony Fails, or Walter Bishop to commit murder, she cannot be deemed to have solicited them to kill with malice. Rather, she solicited them to kill for her protection. Thus, if the jury believes her, she should not be found guilty of solicitation to commit murder. Due to the erroneous instruction as to imperfect self-defense, which the court explained could apply to all of the charged crimes, her solicitation convictions must also be vacated and remanded for a new trial.

**CONCLUSION**

We hold that Porter presented sufficient evidence that she feared imminent harm to be entitled to an imperfect self-defense jury instruction. Additionally, we hold that the substantive error in the delivered instruction was not harmless and infected the verdict as to each of the charges against her. Thus, we remand for a new trial on all counts.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF AN ORDER VACATING PETITIONER'S CONVICTIONS AND REMANDING THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL. COSTS TO BE PAID BY RESPONDENT.**

35

IN THE COURT OF APPEALS
OF MARYLAND

No. 88
September Term, 2016

KARLA LOUISE PORTER

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty

JJ.

Dissenting Opinion by Greene, J. which
McDonald and Getty, JJ., join.

Filed: August 7, 2017

Respectfully, I dissent.

The Majority Opinion expands the doctrine of self-defense beyond the limits of immediacy and necessity in concluding that a criminal defendant who was charged with the crimes of solicitation, conspiracy, and first degree premeditated murder after arranging for a third party to kill her husband was entitled to a jury instruction on imperfect self-defense. Even if a battered spouse has a subjective belief that death or serious bodily harm at the hands of her abuser is inevitable, a murder planned weeks or months in advance can at most be considered a response to a generalized threat or expected future threat, but not a response to an imminent or immediate threat. In other words, even if the battered spouse syndrome can show that the spouse has a generalized fear, the syndrome cannot substitute for the requirement of an imminent or immediate threat for imperfect self-defense.

The Court of Special Appeals determined that there was no specific evidence that Ms. Porter, at the time of the murder of her husband, believed that she was in imminent danger of death or serious bodily harm. I agree with the intermediate appellate court that Ms. Porter failed to generate "some evidence" that at the moment the hired killer, Mr. Bishop, fired the fatal shot into Mr. Porter that she (Ms. Porter) subjectively believed that she was in imminent or immediate danger of death or serious bodily harm. Furthermore, Maryland Code (1991, 2013 Repl. Vol.), § 10-916 of the Courts and Judicial Proceedings Article ("CJP") does not expand the contours of the self-defense doctrine by weakening or eliminating the requirement that the defendant act in response to an imminent or immediate threat. And, as all of our sister jurisdictions to examine the issue have held, a spouse who enters into contracts with third parties to kill an alleged abuser may believe death at the

hands of her abuser is inevitable; the defendant is not acting in response to an imminent threat, and consequently should not receive a self-defense instruction. Accordingly, Ms. Porter was not entitled to a jury instruction on imperfect self-defense.[1]

### A. The Imminent or Immediate Requirement for Imperfect Self-Defense

We held in *State v. Faulkner*, 301 Md. 482, 483 A.2d 759 (1984) that "the honest but unreasonable belief standard of imperfect self-defense" is not a complete defense because it "mitigates murder to voluntary manslaughter." *Id.* at 486–500, 483 A.2d at 761– 68. Our opinion in *Dykes v. State*, 319 Md. 206, 571 A.2d 1251 (1990) provided the following explanation:

> It is clear from our *Faulkner* [decision] that when evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense. . . . [Thus,] the defendant has the burden of initially producing some evidence on the issue of mitigation or self-defense [to entitle him or her to a jury instruction]. Once the issue has been generated by the evidence, however, the State must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue. . . . [Some evidence is defined as] any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his [or her] burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Dykes*, 319 Md. at 215, 217, 571 A.2d at 1256–57 (internal citations and quotation marks omitted).

---

[1] Ms. Porter was also charged with solicitation and conspiracy charges, but imperfect self-defense does not apply to the crimes of solicitation and conspiracy. *See Jones v. State*, 357 Md. 408, 422, 745 A.2d 396, 403 (2000) ("The doctrine of imperfect self-defense applies only to 'criminal homicide and its shadow forms, such as attempted murder.'").

We explained in *State v. Smullen*, 380 Md. 233, 250–51, 844 A.2d 429, 439 (2004), among other things, that the battered spouse syndrome statute permits the jury to analyze the elements of self-defense in a more sophisticated way. When the syndrome is "applied in a proper setting, [it] can thus, depending on the circumstances, support both the subjective honesty of the defendant's perception of imminent harm and the objective reasonableness of such a perception." *Id.* at 251, 844 A.2d at 439. However, as the State noted in its brief, the *Smullen* Court "did not relax the requirement of the self-defense doctrine[which is,] that the defendant believe that [he or] she was in immediate and imminent danger." We explained that it is the defendant's burden to produce "some evidence" that, "in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger." *Id.* at 273, 844 A.2d at 453.

Mr. Smullen's self-defense was based upon a claim of battered child syndrome. *Id.* at 238, 844 A.2d at 431. As his adoptive father sat on the couch reading a newspaper, Mr. Smullen snuck up behind his father and killed him by stabbing and cutting him repeatedly with a butcher knife. *Id.* at 240, 844 A.2d at 433. We affirmed the trial court's exclusion of Mr. Smullen's claim of past abuse, psychiatric testimony and hearsay statements about alleged past abuse. *Id.* at 238, 844 A.2d at 432. In reversing the judgment of the Court of Special Appeals we explained:

> The panel majority . . . effectively repeal[ed] the well-established requirement of self-defense that there be some *contemporaneous* overt act or threat by the victim, sufficient to instill in the defendant an honest, even if unreasonable and erroneous, subjective belief of imminent death or serious bodily injury that required the deadly response undertaken by the defendant.

3

> It equated the statutory application of the battered spouse syndrome doctrine, notwithstanding evidence that the defendant was the "first aggressor," with the notion that the doctrine, as to both spouses and children, applied as well when there was no *contemporaneous* act or threat which even the defendant regarded as presenting an imminent danger of harm.

*Id.* at 250, 844 A.2d at 439 (emphasis added).

Thus, I agree with the State that one of the lessons of *Smullen* is that the kind of generalized fear that Ms. Porter had in response to a threat days before did not generate the issue of self-defense. In other words, as the State argued, to generate the issue of self-defense, the defendant must present "some evidence that she perceived a contemporaneous danger of severe bodily injury or death in response to a warning sign that she perceived as a threat or overtly hostile act by the victim."

Our case law has established that the requisite state of mind for imperfect self-defense is that the "fear must be of imminent death or serious bodily injury." *State v. Martin*, 329 Md. 351, 365 n.6, 619 A.2d 992, 999 n.6 (1993). As the Majority Opinion concedes, our case law has not defined "immediate" or "imminent." The ordinary meaning of "immediate" includes: "occurring without delay[.]" *Immediate definition*, BLACK'S LAW DICTIONARY (10th ed. 2014). The ordinary meaning of "imminent" is "[a]bout to occur at any moment[.]" *Imminent definition*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005).

The Majority Opinion gives the term "imminent" an all-encompassing meaning. Contrary to the Majority's holding in this case, evidence as to the battered spouse syndrome cannot be used to show that a battered spouse felt that he or she was under an imminent or immediate threat of death or serious bodily harm at all times. In doing so, the Court relaxes

4

the requirement of real or apparent necessity as the traditional basis for justification of homicide. "Such reasoning proposes justifying the taking of human life not upon the reasonable belief [that] it is necessary to prevent death or great bodily harm—which the imminence requirement ensures—but upon purely subjective speculation that the decedent probably would present a threat to life at a future time and that the defendant would not be able to avoid the predicted threat." *State v. Norman*, 378 S.E.2d. 8, 15 (1989) (A broad and indefinite interpretation of the word "imminent" results in a subjective speculation that the decedent will probably pose a threat in the future and "weaken[s the law's] assurances that justification for the taking of human life remains firmly rooted in real or apparent necessity."). For example, in the present case, without the requirement of imminency, the danger exists that a jury could find that imperfect self-defense applies not because the defendant acted out of an excusable belief that her actions were necessary to protect herself, but simply because the jury sympathizes with the defendant's history of receiving abuse at the hands of the man she killed. That is not and cannot be the law—however much a jury may sympathize with the defendant, and however much the jury may feel the victim has acted in a morally repugnant manner, such impressions cannot be permitted to justify the greatest and most permanent crime, the taking of another's life.

Moreover, the result of the Majority opinion contravenes the intent of our Legislature when it enacted CJP § 10-916. That statute provides that a court has *discretion* to admit evidence as to the battered spouse syndrome:

> Admissibility of evidence. — Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant

5

was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome . . . the court *may* admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by [the victim of the defendant's alleged crime]; and
(2) Expert testimony on the Battered Spouse Syndrome.

§ 10-916(b) (emphasis added).

Section 10-916 originated as House Bill 49 and Senate Bill 141 in 1991. The bill file contains a Floor Report associated with House Bill 49 recognizing that "[t]his bill would clarify that the court has discretion to admit evidence of repeated physical and psychological abuse of the defendant by the alleged victim and expert testimony on the battered spouse syndrome." Floor Report, Bill File, H.B. 49 (Md. 1991). The bill, in fact, underwent substantive changes to guarantee that the statute was permissive and discretionary. Drafts of House Bill 49 show the striking of mandatory language such as the word "requiring" as well as the words "a court shall admit such evidence" from its initial version; the mandatory language was replaced with discretionary language in the current version, which provides that "the court *may* admit" such evidence.

The bill file contains other evidence that the Legislature did not intend for the statute to apply in all spousal murders. A letter from the House of Ruth, for example, addressed to the House Judiciary Committee, explained the effect of the House Bill 49 in a section titled "Myths About HB 49":

MYTH #1: THIS BILL TIES THE HANDS OF THE TRIAL COURT.
House Bill 49 does NOT require the court to admit this evidence in every case. This bill has been purposefully written in permissive language ("the court may admit evidence") in order to allow the court the broadest

6

latitude possible to control the conduct of a trial without restricting the defendant's constitutional right to a full and fair hearing.

MYTH #2: THIS BILL IS A "LICENSE TO KILL"

This bill is NOT a license to kill any more than current self defense law promotes killing. This bill only permits a defendant to explain why he or she thought it reasonable to act as they did on a particular occasion.

\*       \*       \*

MYTH #4: THE BATTERED SPOUSE SYNDROME WILL BECOME A NEW DEFENSE TO MURDER.

This myth completely misunderstands the law of self defense and imperfect self defense. Evidence of the Battered Spouse Syndrome is offered in support of the state of mind element of perfect and imperfect self defense – in other words, it is offered to prove the honesty and reasonableness of the defendant's belief he or she was in *imminent* danger at the time of the offense.

\*       \*       \*

The bill is permissive, rather than mandatory, allowing ample room for the trial court to exclude evidence which is clearly irrelevant or too distant in time to support the defendant's claim.

Letter to House Judiciary Committee, Bill File, H.B. 49 (Md. 1991) (emphasis added). The Legislature could not have intended—and did not intend—for the battered spouse syndrome evidence to generate a perfect or imperfect self-defense jury instruction when there is no evidence of an imminent or immediate risk of harm to the defendant.

In the present case, Ms. Porter did not present evidence that her husband was the aggressor and that, at the time and place of the shooting, Ms. Porter felt herself in imminent danger of death or serious bodily injury. Ms. Porter did not testify that at the particular time of the shooting at the gas station she had a specific fear of death or serious bodily harm. Thus, in Ms. Porter's case there was a crucial evidentiary gap as to the state of mind element for imperfect self-defense, namely, that she subjectively felt herself under imminent or immediate threat of death or serious bodily harm. The evidence which Ms. Porter submitted to show that she was a battered spouse could legitimately have been

7

considered by the jury to explain why Ms. Porter was reluctant to seek help prior to the killing, or to show that certain behavior on the part of Mr. Porter which an ordinary person would not perceive as imminently threatening was subjectively so to Ms. Porter. But, contrary to the Majority's position, it is not the kind of evidence that could replace the total lack of evidence that Ms. Porter subjectively believed that she was in imminent or immediate danger at the time of the killing. The evidence of threatening or abusive behavior by Mr. Porter days or weeks before the killing, and of Ms. Porter's subjective belief that she faced a general or looming threat from Mr. Porter is simply not enough on its own to show that, at the moment of the killing, she subjectively believed that there was an imminent threat and that she needed to respond to defend herself.

## B. Contract Killing

Furthermore, the events of this case fall squarely into the category of "contract killing,"[2] in which "courts have unanimously refused to permit instructions to the jury on self-defense claims." John W. Roberts, *Between the Heat of Passion and Cold Blood: Battered Woman's Syndrome As an Excuse for Self-Defense in Non-Confrontational Homicides*, 27 LAW & PSYCHOL. REV. 135, 145 (2003).

In *People v. Yaklich*, Mrs. Yaklich hired Charles and Eddie Greenwell to kill her husband; she was asleep in the family home when the Greenwells killed Mr. Yaklich in the family's driveway. The Colorado Court of Appeals did "not agree that a self-defense

---

[2] I limit my opinion to the subset of non-confrontational killings in which the battered spouse has hired someone to kill her alleged abuser; thus, I do not speculate as to the use of the battered spouse syndrome in other non-confrontational settings.

instruction [was] available in a contract-for-hire case for three reasons." *People v. Yaklich*, 833 P.2d 758, 763 (Colo. App. 1991). Firstly, no other jurisdiction in the country allowed such an instruction for battered women in a murder-for-hire contract, "no matter how the jurisdiction has defined imminent." *Id.* "Secondly, a self-defense instruction in a murder-for-hire situation would undermine ancient notions of self-defense which originated in the common law." *Id.* And, lastly, allowing such an instruction would serve as poor public policy. The Court indicated that it would be unfair for the Greenwells to be convicted of murder, while Mrs. Yaklich would receive a lesser sentence, "escap[ing] punishment by virtue of an unprecedented application of self-defense[,]" despite the fact that she was the one who sought out the Greenwells and were it not for her they would not be involved in the murder. *Id.* Ultimately, "Yaklich's evidence, even if taken as true, was insufficient as a matter of law to support her theory that she was in imminent danger at the time her husband was killed. Therefore, the trial court erred in giving a self-defense instruction to the jury." *Id.* The Court concluded that "the result reached reasonably balances an individual's inherent and time honored right of self-preservation with the great value our society places on human life." *Id.*

The Missouri Court of Appeals also refused to allow a self-defense instruction due to the lack of imminency in a "murder-for-hire" case:

> [T]he facts of the killing here do not support a self-defense claim or use of the battered spouse syndrome. [Defendant] hired or lured the killers into the crime. There was no evidence of self-defense of assaults of the husband when he was shot. [Defendant] had been talking for over three months prior to the murder about how to have her husband killed, with payment to the assailants out of his insurance proceeds.

9

*State v. Anderson*, 785 S.W.2d 596, 600 (Mo. Ct. App. 1990) (holding that the defendant did not prove she was in immediate danger at the time of the killing and, thus, failed to make a *prima facie* showing of self-defense); *see also State v. Leaphart*, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983) (holding the lower court was correct in failing to provide a self-defense instruction because the wife was not in imminent danger at the time her husband was killed by two men who she hired); *State v. Martin*, 666 S.W.2d 895 (Mo. App. 1984) (upholding the exclusion of the battered woman syndrome evidence where defendant hired a third party to kill her husband because the mere possibility that her husband would blow up their marital home when she was in it did not create immediate danger at the time of killing). The Michigan Court of Appeals also found that self-defense is not available to battered women in a "gun-for-hire" situation because there is no imminent danger. *People v. Varner*, No. 224865, 2002 WL 741531, at *1 (Mich. Ct. App. Apr. 23, 2002) ("Self-defense in Michigan requires a finding that the defendant's actions were justified because she honestly and reasonably believed that her life was in imminent danger or that there is a threat of serious bodily harm. . . . A person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm, but self-defense is not available to repel a potential force."); *see also Varner v. Stovall*, 500 F.3d 491, 500 (6th Cir. 2007) ("The Michigan courts acted reasonably when they held that Varner, in hiring a contract killer, did not 'act out of passion'. . . Whether it is a question of self-defense or a question of provocation, Varner fails to explain why an individual who faces

10

a nonimminent threat is not just as capable of calling the authorities as of hiring a contract killer.").  The Ohio intermediate appellate court ruled similarly:

> [A]ppellant had several conversations on different days concerning her wish to have her husband murdered.  This type of planning dispels the notion that appellant was in the sort of imminent danger of harm that justifies the use of deadly force.  Because the evidence in the record indicates that appellant was not entitled to the affirmative defense of self-defense, counsel's failure to introduce evidence that appellant was suffering from battered woman syndrome did not deprive appellant of her right to effective assistance of counsel.

*State v. Fink*, No. CA94-10-009, 1995 WL 447791, at \*2 (Ohio Ct. App. July 31, 1995).

Our sister jurisdictions have been clear that a contract killing scenario is incompatible with imperfect self-defense which requires that a defendant respond to an imminent or immediate threat.  In all of the cases discussed above, as well as this case, the defendant planned the killing well in advance with a hired confederate.  During this advance planning period, it is at least possible that a defendant subjectively—although in most if not all of the cases plainly unreasonably—believed that killing her abuser was a necessary response to a perceived risk of death or serious bodily harm.  But, as the planning period stretches into days, weeks, or even months, it would be strange that any defendant who was still in full possession of her faculties could possibly believe, even subjectively, that all her advance planning was to protect herself from an imminent or immediate threat.  Rather, a defendant would at most be acting in response to *prior* threating incidents, or to a generalized state of fear that an abuser *might* harm her at an unspecified time in the future.  Thus, contract killing is entirely distinct from the proper application of battered spouse syndrome evidence in an imperfect self-defense case, which is to show that behavior that

11

might not be objectively imminently threatening was subjectively so the battered spouse, either because of her long familiarity with the abuser or because she could recognize that the behavior indicated the climax of a "cycle" of abuse.

Ms. Porter planned her husband's murder weeks before it actually took place. After considering other prospects to hire, Ms. Porter settled on hiring Mr. Bishop and promised to pay him $400 towards his child support obligation for his services. Although there was evidence that Ms. Porter sustained abuse in the "week or so" before her husband's murder, the planning of his killing started at least nine months earlier. Additionally, it was only after three attempts to secure Mr. Porter's death that Ms. Porter connected with Mr. Bishop. Moreover, on the morning of the murder, she lured her husband to the gas station that they owned in order to carry out her plan; she met with Mr. Bishop at a McDonald's prior to the staged robbery, and she accompanied Mr. Bishop into the gas station from a side door.

Taken together, these facts undermine Ms. Porter's subjective belief that she was in imminent danger on the morning of March 1, 2010 and creates an attenuation too great to support the idea of an imminent threat to her life. I would adopt the Court of Special Appeals' position that Ms. Porter's "active participation in an elaborate conspiracy to kill her husband places her outside of the class of persons for whose protection the Battered Spouse Statute was enacted." *Porter v. State*, 230 Md. App. 288, 329, 148 A.3d 1, 25 (2016). Under the circumstances of this case, Ms. Porter's planning of her husband's demise dispels the notion that she was in the sort of imminent danger of serious bodily harm that justifies the use of deadly force. Where a third party was hired by the defendant to murder her husband, and thus there was no evidence that Ms. Porter, on the morning of

12

the murder of her husband, believed that she was in imminent danger, she should not have been entitled to a jury instruction on imperfect self-defense.

## C. Conclusion

For the above reasons, I would adopt the reasoning of the Court of Special Appeals and hold that Ms. Porter was not entitled to an imperfect self-defense instruction and, therefore, the trial court's error in issuing an improper imperfect self-defense instruction was harmless. The Majority opinion takes an unprecedented pivot in the area of imperfect self-defense by relaxing the requirement of an imminent and immediate threat for a battered spouse. And, a defendant who hires a third party to murder her spouse, even if she is suffering from battered spouse syndrome, should not be entitled to a perfect or imperfect self-defense instruction. This is so because a contract killing by its nature is more consistent with an act of retaliation for past abuse. Thus, respectfully, I dissent.

Judges McDonald and Getty have authorized me to state that they join in this dissent.

13