*Allan Jackson v. State of Maryland*, No. 78, September Term, 2017. Opinion by Greene, J.

**EVIDENCE — MARYLAND RULE 5-901 — AUTHENTICATION — VIDEO SURVEILLANCE FOOTAGE:**

The Court of Appeals held that a compact disk containing video surveillance footage from a Bank of America ATM was properly authenticated after Bank of America's protective services manager testified as to the process he used to view the ATM surveillance footage, and that he then requested that the footage be copied and sent directly to the detective investigating the alleged crimes. The testifying witness was unable to cut, paste, modify or enhance the footage in any way. The witness verified that the video segment moved into evidence was the video segment he had previously viewed. The discrepancy between the video footage's time-stamp and the time-stamp on the ATM receipt for a single transaction does not undermine the authenticity of the compact disk.

**EVIDENCE — MARYLAND RULE 5-803(b)(6) — BUSINESS RECORDS EXCEPTION — BANK STATEMENTS:**

The Court of Appeals held that a bank statement was properly authenticated after the account holder testified that he had received the bank statement from his bank's personnel the day after unauthorized withdrawals were made from his account. The bank statement satisfied the four requirements of Md. Rule 5-803(b)(6), the business record exception to hearsay, because it was made at or near the time of the unauthorized withdrawals, it was made by PNC, which had knowledge of the transactions, it was a statement "made and kept in the course of a regularly conducted business activity" and, finally, it was the regular practice of PNC bank to make and keep these statements.

Circuit Court for Baltimore City
Case No. 115230020
Argued: May 31, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 78

September Term, 2017

ALLAN JACKSON

v.

STATE OF MARYLAND

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

Opinion by Greene, J.

Filed: July 12, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

In this criminal case, Petitioner Allan Jackson ("Mr. Jackson") challenges the admissibility of two items of evidence that he claims lacked authenticity and were, thus, inadmissible. Specifically, we review the requisite evidentiary foundation for the admission into evidence of a bank statement record as well as a compact disk containing video surveillance footage. Because we determine that the evidence was properly authenticated under the Maryland Rules of Evidence, we shall affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Jackson was tried by a jury in the Circuit Court for Baltimore City on nine separate criminal counts.[1] The charges against Mr. Jackson stemmed from an alleged home invasion on April 29, 2015. Testimony from the victim of the crime, Donald Daggett, described a confrontation at his home wherein Mr. Jackson pushed his way into Mr. Daggett's home, wielding a knife, and demanded money. Mr. Daggett surrendered some cash and his PNC Bank card as well as the card's personal identification number. According to the State, Mr. Jackson thereafter stole Mr. Daggett's van and used Mr. Daggett's bank card to make four unauthorized withdrawals from the ATM at the Bank of

---

[1] The jury considered nine charges, which included: home invasion and first-degree burglary, pursuant to Criminal Law Article § 6-202; robbery, pursuant to Criminal Law Article § 3-402; robbery with a dangerous weapon, pursuant to Criminal Law Article § 3-403; first-degree assault, pursuant to Criminal Law Article § 3-202; second-degree assault, pursuant to Criminal Law Article § 3-203; theft of at least $1,000 but less than $10,000, pursuant to Criminal Law Article § 7-104; unlawful taking of a motor vehicle, pursuant to Criminal Law Article § 7-105; and wearing or carrying a deadly weapon with intent to injure, pursuant to Criminal Law Article § 4-101.

America Brooklyn-Curtis Bay branch at 3601 S. Hanover Street. The withdrawals exceeded $1,000 and were made over a span of several hours during the night of April 29, 2015, through the early morning of April 30, 2015.

After a five-day trial, the jury convicted Mr. Jackson of two of the nine counts: first-degree assault[2] and theft of at least $1,000 but less than $10,000.[3] Relevant to our inquiry is Mr. Jackson's conviction of theft of at least $1,000. To prove that Mr. Jackson withdrew funds, without authorization, from Mr. Daggett's PNC account, the State first introduced two ATM receipts, which had been recovered from the stolen van. One ATM receipt reflected a withdrawal in the amount of $200 from the Bank of America Brooklyn-Curtis

---

[2] Section 3-202 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) provides:

> (a) (1) A person may not intentionally cause or attempt to cause serious physical injury to another.
> (2) A person may not commit an assault with a firearm, including:
> (i) a handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle, as those terms are defined in § 4-201 of this article;
> (ii) an assault pistol, as defined in § 4-301 of this article;
> (iii) a machine gun, as defined in § 4-401 of this article; and
> (iv) a regulated firearm, as defined in § 5-101 of the Public Safety Article.

[3] At the time of Mr. Jackson's conviction, Section 7-104 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.), provided, in relevant part:

> (a) A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person:
> (1) intends to deprive the owner of the property;
> (2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or
> (3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.
> &ast; &ast; &ast;
> (g) (1) A person convicted of theft of property or services with a value of:
> (i) at least $1,000 but less than $10,000 is guilty of a felony[.]

2

Bay ATM at 11:43 p.m. on April 29, 2015. The second receipt reflected a withdrawal in the amount of $200 from the Bank of America Brooklyn-Curtis Bay ATM at 12:20 a.m. on April 30, 2015. Additionally, the State produced two still photographs from a surveillance video at the Brooklyn-Curtis Bay ATM location, which captured an image of a man resembling Mr. Jackson standing near the ATM at 11:43 p.m. on April 29, 2015, and again at 12:20 a.m. on April 30, 2015.

In addition, the State introduced two compact disks ("CD") containing video surveillance footage. The first CD showed the events that occurred at the Bank of America Brooklyn-Curtis Bay ATM during the period of 11:15 p.m. to 11:35 p.m. on April 29, 2015. The second disk showed video surveillance of events that occurred during the period of 12:10 a.m. and 12:30 a.m. on April 30, 2015.[4] It is undisputed that the man depicted in the video footage standing near the ATM resembles Mr. Jackson.

Finally, the State, through Mr. Daggett's testimony, introduced a bank statement from PNC bank for the business checking account of Mr. Daggett's business, Double D Tires, LLC. The bank statement reflected an accounting period of April 1, 2015, through April 30, 2015. As part of the same exhibit, there was a two-page "Account Transaction Detail Report," which showed each transaction in chronological order for the period of April 1, 2015, through April 30, 2015. The State's exhibit showed four ATM withdrawals from the Double D Tires, LCC account, which had posted to the account on "4/30."

---

[4] Mr. Jackson does not challenge the evidence shown in the video between 12:10 a.m. and 12:30 a.m.

Specifically, the amounts of each individual withdrawal were $203, $503, $203 and $203, which totaled $1,112. The State's exhibit, in its entirety, was moved into evidence.

The jury convicted Mr. Jackson of first-degree assault and theft of at least $1,000 but not more than $10,000. In an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. *Jackson v. State*, No. 1516, 2016 Term (Md. Ct. Spec. App., Oct. 11, 2017). The intermediate appellate court held that the disk segment containing the surveillance footage was properly authenticated by the Bank of America employee. The employee's testimony verified that the footage on the disk was a fair and accurate representation of what he had seen previously while viewing the bank's stored images of the cameras surrounding the Brooklyn-Curtis Bay ATM. Next, the Court of Special Appeals concluded that the PNC bank statements satisfied the four requirements of the business record hearsay exception, under Md. Rule 5-803(b)(6), and, thus, were properly authenticated.

Mr. Jackson filed a petition for writ of certiorari in this Court, which we granted to answer the following questions:

1. Whether the Court of Special Appeals erred in holding that evidence had been properly authenticated, despite acknowledging that the evidence was not what its proponent claimed.

2. Whether records of regularly conducted business activities can be authenticated through inferences and "common knowledge," even though Rule 5-902 requires "[t]estimony of authenticity."

*Jackson v. State*, 457 Md. 397, 178 A.3d 1241 (2018).

We hold that the Court of Special Appeals did not err when concluding that the CD was properly authenticated and that the bank statements were admissible under the business records exception to the hearsay rule. Accordingly, we affirm the judgment of the intermediate appellate court.

## DISCUSSION

### *Parties' Arguments*

In this case, Petitioner asks us to decide whether the introduction of the CD of the surveillance video footage, which was recorded at the Bank of America Brooklyn-Curtis Bay ATM on April 29, 2015, between 11:15pm and 11:35pm, was properly authenticated. Petitioner argues that the CD of the surveillance video was not properly authenticated because the video does not show what the State claimed it showed—specifically, a withdrawal of $200 from Daggett's bank account at 11:43 p.m. on April 29, 2015.[5]

---

[5] On direct of examination of its witness Brett Cunningham, the Protective Services Manager from Bank of America, the State elicited the following testimony:

> [STATE]: And did there come a time when Detective Green-Dargan contacted you asking about security video for ATM transactions at that branch?
> [CUNNINGHAM]: Yes.
> [STATE]: And in response to her inquiry, what action if any did you take?
> [CUNNINGHAM]: She had emailed me some receipts for the ATM and I accessed the video for that site and pulled up some images of who was at the ATM and emailed them to her to verify that's what she was looking for.

On re-direct of Mr. Cunningham, the State more directly connected the ATM receipts to the surveillance video segments that Mr. Cunningham had requested:

> [STATE]: So you were looking for security video based on transactions – based on the times that were on, that you read onto the record?

(continued . . . )

According to Petitioner, the intermediate appellate court's holding, which upheld the admission of the videotape on the basis of authenticity, "is impossible to square with the plain text of Md. R. 5-901(a)." Petitioner reasons that this Court's affirmance of that holding "would undercut fundamental principles of trust and fairness in judicial proceedings." According to Petitioner, "[w]hat follows logically . . . is that parties may distort, misrepresent, or even lie about the evidence that they present to the jury, so long as that evidence is somehow labeled as what it actually is." Petitioner asserts that the proper authentication of the surveillance footage turns on whether the evidence is "sufficient to support a finding that the matter in question is what its proponent claims," as provided in Md. Rule 5-901(a). Mr. Jackson argues that the video footage was "not what the State claimed," and, therefore, was not properly authenticated.

The State, on the other hand, reasons that the Bank of America employee, Brett Cunningham, who testified about the CD, filled the "authentication gaps" that were at issue in *Washington v. State*, 406 Md. 642, 691 A.2d 1110 (2008). According to the State, the CD was properly authenticated based on Mr. Cunningham's testimony that the video was a reliable and accurate depiction of the events of that time period.

---

(. . . continued)

> [CUNNINGHAM]: Yes.
> [STATE]: And you testified earlier that when [you] made the request for copies of the video, you had the same times and they correspond to those receipts; is that correct?
> [CUNNINGHAM]: Yes.

*i. Admission of ATM Surveillance Footage*

Maryland Rule 5-901(a) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A threshold requirement of admissibility of evidence is whether the authenticity of the evidentiary matter may be established. Authentication refers to a process of "laying a foundation for the admission of such nontestimonal evidence as documents and objects." Hornstein & Weissenberger, *Maryland Evidence: 2002 Courtroom Manual*, at 306. Underlying that process is the question of whether the evidence is what it is claimed to be. *See* 7 McLain*, Maryland Evidence* §5-901:4(a), at 284 ("The fact that must be fulfilled by every offer of real proof, on which its relevance depends, is that the evidence is what its proponent claims it to be."). Authentication "is integral to establishing [the matter's] relevancy." *Sublet v. State*, 442 Md. 632, 656, 113 A.3d 695, 709 (2015). "Conceptually, the function of authentication or identification is to establish, by way of preliminary evidence, a connection between the evidence offered and the relevant facts of the case." Hornstein & Weissenberger, *Maryland Evidence: 2002 Courtroom Manual*, at 306.

Maryland's Rule 5-901(a) is identical to its federal counterpart, Federal Rule of Evidence 901(a). When interpreting Rule 901(a), the United States District Court for the District of Columbia has articulated that a "Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so." *U.S. v. Safavian,* 435 F.Supp.2d 36, 38 (D.D.C. 2006) (emphasis in original). The threshold of admissibility is, therefore, slight. *See generally*

7

*Sublet*, 443 Md. at 656-57, 113 A.3d at 709-10 (explaining that our adoption of Md. Rule 5-901 was intended to codify our common law of evidence, which was based upon Federal Rule of Evidence 901(a)).

We have previously explained that, for purposes of admissibility, a videotape is subject to the same authentication requirements as a photograph. *Washington*, 406 Md. at 651, 961 A.2d at 1115. Photographs and videotapes may be authenticated through first-hand knowledge, or, as an alternative, as "a 'mute' or 'silent' independent photographic witness because the photograph speaks with its probative effect." *Id*. at 652, 961 A.2d at 1115 (quoting *Washington v. State*, 179 Md. App. 33, 44, 943 A.2d 704, 711 (2008)). We explained in *Washington* that "so long as sufficient foundational evidence is presented to show the circumstances under which it was taken and the reliability of the reproduction process," photographs may be admissible as probative evidence. *Id*. at 652, 961 A.2d at 1116. This Court has yet to adopt "any rigid, fixed foundational requirements" for admission of evidence under the "silent witness" theory. *See Dep't of Pub. Safety & Corr. Servs. v. Cole*, 342 Md. 12, 26, 672 A.2d 1115, 1122 (1996). The foundational basis may be established through testimony relative to "the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system." *Washington*, 406 Md. at 653, 961 A.2d at 1116 (quoting *United States v. Stephens*, 202 F.Supp.2d 1361, 1368 (N.D. Ga. 2002)).

In the instant case, the State sought to admit a CD containing video surveillance footage showing the events that occurred at the Bank of America Brooklyn-Curtis Bay ATM during the period of 11:15 p.m. to 11:35 p.m. on April 29, 2015. Prior to the CD's

admission, the State relied on the testimony of Brett Cunningham, Bank of America's Protective Services Manager, in order to provide the foundation for the CD's authenticity. Mr. Cunningham described the process he used to access the ATM video footage, which entailed accessing a Digital Video Recording "program and pull[ing] up the Curtis Bay branch for that date and time and the cameras that I was looking for." Once he had located the date, time and cameras for the Brooklyn-Curtis Bay branch relative to the incident, Mr. Cunningham testified that he then "exported the images into a digital file and emailed them to [the detective]." Mr. Cunningham was not able to modify, cut, paste, or enhance the video in any way. According to his testimony, Mr. Cunningham, in fact, did not even have the ability to *copy* the file directly to another storage device, such as a thumb drive or DVD. Once Mr. Cunningham received confirmation from the detective, he was then required to submit a specific request with date, time, location and camera specifications to a Bank of America team located in North Carolina, who would "download the requested video and mail it directly to the detective." Mr. Cunningham testified that he submitted requests for two time ranges, including April 29, 2015, starting at 11:15 p.m. to end at 11:35 p.m. as well as April 30, 2015, starting at 12:10 a.m. to end at 12:30 a.m.

When the State moved to admit the CD containing video footage of the Brooklyn-Curtis Bay ATM location on April 29, 2015, at 11:15 p.m. to 11:35 p.m., it did so without proffer. Petitioner's trial counsel objected. His argument at that time belies the one Petitioner makes before us now. Mr. Jackson's objection at trial was based not on the authenticity of the video footage but on its *relevancy*:

9

Your Honor, my concern is this, the gentleman Mr. Cunningham indicated that he didn't, let me see his wording, didn't review the details of the transaction involved. As a result, I'm not certain from listening to him testify that he has linked this particular video to the transaction in this particular case, and if that's the case, that would make the *relevance* questionable.

(Emphasis added.) The Circuit Court admitted the evidence over objection and explained:

Well, the receipts are in evidence already [] showing what dates and times they are[. T]he relevance is conditional on the State tying it together, but the jury would certainly have a basis to believe that these are the appropriate time corresponding to those receipts and that's all that's necessary to bring it in as authentic. Whether the State ultimately ties it all together would be a matter of convincing the jury that it all relates. But the foundation is sufficient to show that these are fair and accurate reproductions of what those cameras captured at those particular times.

We agree.

The question of authenticity is whether the evidence "is what its proponent claims" it to be. Rule 5-901(a). In that regard, given the foundation that the State provided through Mr. Cunningham's testimony, the video surveillance footage *is* what Mr. Cunningham sought when he submitted his request to the Bank of America team in North Carolina: four exterior camera angles of the ATM on April 29, 2015, starting at 11:15 p.m. to 11:35 p.m. Mr. Cunningham testified that the CD introduced at trial was what he had viewed on May 18, 2015, when he first viewed Bank of America's DVR program. The ATM surveillance video does not include the 11:43 p.m. transaction, as suggested by Mr. Cunningham in his trial testimony. Thus, the April 29, 2015, footage is not directly relevant to the 11:43 p.m. transaction. The absence of the 11:43 p.m. transaction, however, does not detract from the video's authenticity. For the jury to properly rely on the video footage as a "silent witness,"

10

as probative evidence in itself, the State was required to establish "sufficient foundational evidence [] to show the circumstances under which it was taken and the reliability of the reproduction process." *Washington*, 406 Md. at 652, 961 A.2d at 1116 (citing *People v. Bowley*, 382 P.2d 591, 594 (1963)). The State elicited through Mr. Cunningham's testimony the process of reproduction, the reliability of that process, and whether the reproduction was a fair and accurate representation of what the witness had viewed when he submitted a request for the video footage to the Bank of America team in North Carolina. We cannot say that Mr. Cunningham's testimony failed in any respect to properly authenticate the surveillance video footage. As the Court of Special Appeals explained, "'the matter in question' is whether the video showed what it purported to show per its running clock, namely, activity that transpired on April 29, 2015, between 11:15 p.m. and 11:35 p.m. at and about the ATM at the Bank of America Brooklyn-Curtis Bay branch." The surveillance footage serves as a silent witness of the continuous activity at that ATM between 11:15 p.m. and 11:35 p.m. on April 29, 2015. We conclude that the CD containing the video surveillance footage was properly authenticated.

The jury did not have video footage for activity at the Brooklyn-Curtis Bay Branch ATM between 11:36 p.m. and 12:10 a.m. The evidence the jury had included an ATM receipt with a time-stamp of 11:43 p.m. as well as a still-photograph of Mr. Jackson at the Brooklyn-Curtis Bay ATM at 11:43 p.m. Thus, the video footage of 11:15 p.m. to 11:35 p.m., not unlike the ATM receipt, was one of several pieces of evidence available for the jury's consideration. The surveillance footage is obviously limited in what it shows, *e.g.* that Mr. Jackson was at the Brooklyn-Curtis Bay branch ATM during that time period. The

11

video footage could not have proven, for instance, how much money Mr. Jackson withdrew from the account at that time. Notwithstanding, a jury is charged to consider each piece of evidence for its own evidentiary value. With that in mind, the discrepancy between the running clock on the video footage and the State's suggestion that the video footage supported a withdrawal at 11:43 p.m. does not negate the possibility of a withdrawal between 11:15 p.m. and 11:35 p.m. The jury could have determined that the video footage was evidence of Mr. Jackson at the Brooklyn-Curtis Bay ATM during the timeframe of 11:15 p.m. to 11:35 p.m. Additionally, the jury could have reasonably determined that the ATM receipt with a time-stamp of 11:43 p.m., in conjunction with the still photo with the time stamp of 11:43 p.m., showed that Mr. Jackson was at the ATM at 11:43 p.m. The jury, therefore, could have reasonably concluded that Mr. Jackson was involved with all of the unauthorized withdrawals from Mr. Daggett's account.

Petitioner's concern that the intermediate appellate court's holding would invite distortion or misrepresentation of evidence that is presented to the jury highlights the essential role of the trial judge as "gatekeeper." *See Sublet*, 442 Md. at 656, 113 A.3d at 709 ("The role of judge as 'gatekeeper' is essential to authentication, because of jurors' tendency, 'when a corporal object is produced as proving something, to *assume*, *on sight of the object*, *all else that is implied in the case* about it[.]'" (Emphasis in original)). In this case, the trial judge astutely recognized that the State had sufficiently established the foundation for the video footage's authenticity, even if the video's relevance remained conditional on the rest of the State's case. The Court of Special Appeals agreed. Writing for the intermediate appellate court, the Honorable Lawrence Rodowsky succinctly

posited, "As admissible evidence, the April 29 disk segment was available for argument." We agree.

### *ii. Admission of PNC Bank Statements*

Mr. Jackson posed a second inquiry in his petition for certiorari, which asked "whether records of regularly conducted business activities can be authenticated through inferences and 'common knowledge,' even though Md. Rule 5-902 requires 'testimony of authenticity.'" Mr. Jackson argues that Md. Rule 5-902 "governs authentication of business records" and directs us to consider the extrinsic evidence that may be used to authenticate a document under Md. Rule 5-902. Although Mr. Jackson challenges whether the bank statements were genuine, he rejects any applicability of Md. Rule 5-901 or Md. Rule 5-803(b)(6) to a business record.

Maryland Rule 5-902(b)(2), which describes the procedure for admitting self-authenticating documents, provides:

> Testimony of authenticity as a condition precedent to admissibility is not required as to the original or a duplicate of a record of regularly conducted business activity, within the scope of Rule 5-803(b)(6) that has been certified pursuant to subsection (b)(2) of this Rule, provided that at least ten days prior to the commencement of the proceeding in which the record will be offered into evidence, (A) the proponent (i) notifies the adverse party of the proponent's intention to authenticate the record under this subsection and (ii) makes a copy of the certificate and record available to the adverse party and (B) the adverse party has not filed within five days after service of the proponent's notice written objection on the ground that the sources of information or the method or circumstances of preparation indicate lack of trustworthiness.

At the outset, we note that the PNC bank statements were not admitted as self-authenticating documents, pursuant to Md. Rule 5-902. The Circuit Court recognized that

13

the bank statements were evidence of regularly conducted business activity and admitted the statements as such. The Court of Special Appeals affirmed on those grounds. We are not persuaded that Md. Rule 5-902 is the germane focus of our inquiry.

The State argues that Md. Rule 5-901 is the proper vehicle for reviewing the authenticity of the bank statements. As we have stated, Md. Rule 5-901(a) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Recognizing that the trial court admitted the PNC bank statements as a business record under Md. Rule 5-803(b)(6), we nevertheless determine whether, as a condition precedent to admission, the bank statements were authentic.

Although "any authenticity determination is context-specific[,]" a trial judge need only "determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be." *Sublet*, 442 Md. at 678, 113 A.3d at 722. Extrinsic evidence used to establish the necessary evidentiary foundation for authenticating a business record is generally in-court testimony; however, "business records can also sometimes be authenticated by circumstantial evidence of the manner of creation and nature of the document involved." *State v. Bryant*, 361 Md. 420, 429, 761 A.2d 925, 930 n. 4 (2000); *see also Davis v. Goodman*, 117 Md. App. 378, 417, 700 A.2d 798, 817 (1997) ("In some cases the court may properly conclude from the circumstances and the nature of the document involved that it was made in the regular course of business." (quoting 6 McLain, *Maryland Evidence* § 803(b).1, at 379 (1987))).

In the instant case, the State introduced the PNC bank statements of Mr. Daggett's business through his testimony. Mr. Daggett testified that he went to his bank after the incident, told the bank what happened, and explained that he needed to know how much money had been withdrawn from his account. He received the statements directly from his bank's personnel. As the trial judge noted, the bank statements "had all the indicia of a regular statement provided to the business by PNC Bank." The bank statements were admitted as the State's exhibit and contain four pages that reflect a monthly statement. Appended to the monthly statement is a two-page "Account Transaction Detail Report." The statement portion shows a monthly accounting of all activity associated with Mr. Daggett's business, Double D Tire LLC. The "Account Transaction Detail Report" presents the transactions associated with the Double D Tire LLC account in chronological order. The report provides some additional information that is not available in the monthly statement. For example, the report lists whether the transaction required the use of Mr. Daggett's personal identification number and provides a daily account balance in chronological order.

On the monthly statement portion of the bank statements, there are four transactions under the category "ATM/Misc. Check Card Transactions" that are highlighted. The four highlighted transactions are ATM withdrawals from the Brooklyn-Curtis Bay location in the amounts of $203, $503, $203, and $203. On the "Account Transaction Detail Report," there are five transactions highlighted. Four of the five transactions that are highlighted

15

are ATM withdrawals from the Brooklyn-Curtis Bay location.[6]  At trial, Mr. Daggett

testified that the blue highlighting represented the transactions that were unauthorized.

Over Mr. Jackson's objection, the bank statements were admitted.  When admitting the

bank statements, the trial judge reasoned, "Well, I am satisfied that he has testified he got

it from the bank, he's familiar with the account, and he examined it as the transactions that

he did not make.  He also said it had transactions that [he] did make.  There's sufficient

authenticity to it, I'll admit it."  In addition to the extrinsic evidence of Mr. Daggett's

testimony, the Court had already admitted the two ATM receipts that had been recovered

from Mr. Daggett's stolen vehicle.  These receipts bolstered the authenticity of the bank

statements because the receipts each showed a withdrawal of $200 with an additional $3

fee for "ATM Owner Fee."  This amount, $203, appeared on the monthly statement as well

as the "Account Transaction Report" as being two of the four ATM withdrawals from the

Curtis Bay-Brooklyn ATM.  The ATM receipts also indicated that the ATM location was

the Bank of America Curtis Bay-Brooklyn ATM.  We conclude that the bank statements

were sufficiently authenticated.

---

[6] The fifth highlighted transaction is a withdrawal in the amount of $50 that posted to Mr.
Daggett's account on April 30, 2015 and did not require the use of his personal

(continued . . . )

(. . . continued)

identification number.  The Court of Special Appeals explained the lack of significance the
highlighting of this fifth withdrawal has on the remaining four ATM withdrawals: "The
fact that the highlighter wielder overenthusiastically included a withdrawal that [Mr.]
Daggett made that day did not prejudice [Mr.] Jackson.  The proof was that only bank card
withdrawals made after the robbery were unauthorized and these totaled over $1,000."

We turn now to whether the bank statements were properly admitted under Md. Rule 5-803. The Maryland Rules of Evidence preclude the admission of hearsay. Md. Rule 5-802.[7] Notwithstanding, the Rules recognize certain delineated exceptions to the hearsay rule, even when the declarant is available as a witness. *See, e.g.*, Md. Rule 5-803. One of those delineated exceptions allows for the admission of business records, and provides:

> A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Md. Rule 5-803(b)(6).

The purpose of the business record exception is premised on the theory that "because the records are reliable enough for the running of a business, in part because of the business duty imposed on the reporter and the recorder, that they are reliable enough to be admissible at trial." *Hall v. Univ. of Md. Med. Sys. Corp.*, 398 Md. 67, 89, 919 A.2d 1177, 1190 (2007). We have long since recognized that one of the purposes of the business records exception was to "bring the rule of evidence nearer to the standards in responsible

---

[7] Maryland Rule 5-802 provides, "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible."

17

action outside of the courts." *Bethlehm-Sparrows Point Shipyard v. Scherpenisse*, 187 Md. 375, 381, 50 A.2d 256, 260 (1946). This rationale narrowed the need for statements received as testimony to be from personal knowledge or observation. *Id.*

Subject to the four requirements of Rule 5-803(b)(6), bank statements may be admissible as business records. *Bartlett v. Portfolio Recovery Assoc., LLC*, 438 Md. 255, 91 A.3d 1127 (2014). The rationale for admitting bank records as an exception to hearsay is that "bank records, particularly when the bank has no stake in the outcome of litigation, have a strong indicia of reliability." *Id.* at 284, 91 A.3d at 1144 (citing *Chapman v. State*, 331 Md. 448, 459, 628 A.2d 676, 682 (1993)); *see also* 6A McLain, *Maryland Evidence*, § 803(6):1(d) (2013) ("The primary rationale for the business records hearsay exception is a circumstantial guarantee of *sincerity*, because the business will want accurate records on which to rely.").

To lay the foundation for admissibility of a business record, it is not necessary that the testifying witness have "first-hand knowledge of the matter," be the one to have prepared the report, or have "observed the preparation of the report." *Bartlett*, 438 Md. at 284-85, 91 A.3d at 1145 (quoting *Dep't of Pub. Safety & Corr. Servs. v. Cole*, 342 Md. 12, 29, 672 A.2d 1115, 1123 (1996)); *see also Hall,* 398 Md. at 89, 919 A.2d at 1190 (explaining that a business record's inherent reliability exists "*regardless of whether the person who actually did the recording has personal knowledge of the information recorded.*" (Emphasis in original)). In fact, "it is well-established that a custodian of business records does not have to be the custodian 'who was such at the time the record was made.'" *Bartlett*, 438 Md. at 284, 91 A.3d at 1145 (quoting *Killen v. Houser*, 251 Md.

18

70, 76, 246 A.2d 580, 583 (1968)). The "trustworthiness and reliability" of a bank statement as a business record of the bank "arises from the fact that entries recording an act or event are made in the regular course of business and it is the regular course of business to record those entries at the time of that fact or event or soon thereafter." *Id*. at 284, 91 A.3d at 1144 (quoting *State v. Garlick*, 313 Md. 209, 222, 545 A.2d 27, 33 (1988)).

As we have observed, the PNC bank statements were not admitted at trial as self-authenticating documents. The State instead relied on the testimony of Mr. Daggett to establish the authenticity of the bank statements as business records. Taking each requirement of Md. Rule 5-803(b)(6) in *seriatim*, we begin with requirement (A)—that the business record be "made at or near the time of the act, event, or condition, or the rendition of the diagnosis." When the State asked Mr. Daggett about the bank statement's time period, he explained:

> [MR. DAGGETT]: Oh, yes, it was, let's see where it's at, that's the reason they gave me the printout because I went directly there when this happened, so they could tell everything that was taken out at that time.

The bank statement showed all transaction details from April 1, 2015, through April 30, 2015, including an entry on the "Account Transaction Detail Report" that included a withdrawal transaction on April 30, 2015, that was not an ATM withdrawal. The ATM transactions that occurred on the evening of April 29, 2015, and the early morning of April 30, 2015, posted to the bank statement on "4/30." The entries in the bank statement reflected that the bank recorded the transactions "at or near the time" they occurred.

19

Next, subsection (B) of the Rule requires that the record be made "by a person with knowledge or from information transmitted by a person with knowledge[.]" First, Mr. Daggett explained that he received the statements from his bank's personnel after he told the bank representative what happened with his ATM card and requested an accounting. Second, the bank statement reflects information of which PNC bank, as a financial establishment, had knowledge. For example, the bank statement contains the following categories of information and transactions: deposits and other additions, checks and other deductions, daily balance, activity detail, ATM/Misc. check card transactions, services charges and fees, as well as other deductions. Each entry, under all of the aforementioned categories, contains a unique numerical reference number in addition to the date, time and/or, if applicable, corresponding check number of the transaction. Specific to the ATM/Misc. check card category, next to each transaction is an address description of the ATM location. There is also an additional alpha-numeric identifier that is altogether different from the numerical reference number. For example, the four ATM withdrawal transactions that occurred at the Brooklyn-Curtis Bay ATM appear on the statement as illustrated below:

| Date Posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 04/30 | 203.00 | ATM Withdrawal *Brooklyn-Curtis B Baltimore MD | CIMDN2350 0015231 |
| 04/30 | 503.00 | ATM Withdrawal *Brooklyn-Curtis B Baltimore MD | CIMDN2350 0015233 |
| 04/30 | 203.00 | ATM Withdrawal *Brooklyn-Curtis B Baltimore MD | CIMDN2350 0015235 |

04/30         203.00        ATM Withdrawal
                                   *Brooklyn-Curtis B Baltimore MD      CIMDN2350 0015237

All four transactions share the same alpha-numeric identifier of "CIMDN2350." This same alpha-numeric identifier directly corresponds with four entries under "ATM Withdrawal Fee," which show the service charges imposed by PNC bank. Furthermore, this alpha-numeric identifier also matched the two ATM receipts that had been recovered from the stolen vehicle.[8]

On the PNC bank statement, under the category of "Service Charges and Fees," there were four entries of "ATM Withdrawal Fee" in the amount of $2.50, the service charge imposed by PNC for use of a non-PNC Bank ATM, and the fees posted on "04/30." The reference number for each of the PNC ATM withdrawal fees followed sequentially from its corresponding ATM withdrawal transaction that occurred at the Brooklyn-Curtis Bay ATM. In addition to testimony from Mr. Daggett, the jury could infer from this business record that PNC bank reflected on its statement the information of which it had knowledge or information that it had received from another financial institution, namely Bank of America.

Finally, subsections (C) and (D) require that the record be "made and kept in the course of a regularly conducted business activity" and that "the regular practice of that business was to make and keep the memorandum, report, record, or data compilation." The

---

[8] Mr. Cunningham testified that this alpha-numeric identifier was the machine number for the Bank of America ATM at the Brooklyn-Curtis Bay location.

21

Circuit Court concluded that the PNC bank statement "had all the indicia of a regular statement provided to the business by PNC Bank" and the trial judge admitted, over defense counsel's objection, the PNC bank statement.[9]  We agree with the trial judge's conclusion, and reiterate that bank records "have a strong indicia of reliability[.]" *Bartlett*, 438 Md. at 284, 91 A.3d at 1144.  To be sure, PNC Bank had no stake in the outcome of Mr. Jackson's case.  *See Bartlett*, 438 Md. at 284, 91 A.3d at 1144.

In this way, the PNC bank statements are different from the toxicology report offered as a business record in *Bryant*.  In that case, having determined that the certification cover letter as well as the toxicology report failed to meet the requirements of a self-authenticating document, under Md. Rule 5-902, we explored whether the report satisfied Md. Rule 5-803(b)(6) as a business record.  361 Md. at 429-30, 761 A.2d at 930.  We concluded that the testifying witness did not establish the necessary evidentiary foundation because the witness "*never* testified that the report was made at or near the time of the tests or that it was made by a person with knowledge, as Rule 5-803(b)(6) requires."  *Id*. at 430, 761 A.2d at 930 (emphasis in original).  *See also Bernadyn v. State*, 390 Md. 1, 20, 887 A.2d 602, 613 (2005) (rejecting the admissibility of a medical billing statement as a business record for purposes of establishing the defendant's address).  The issue that

---

[9] There was considerable discussion, and perhaps confusion, during a bench conference regarding whether the State was moving to admit the PNC bank statement as a business record of Mr. Daggett's business, or whether the State was moving to admit the PNC bank statement as a business record of PNC Bank.  The Circuit Court judge correctly observed that, "It is a record of the bank, it's a record of the bank provided to him in his business, so that its contents may be referred to, there are some links, there's also some discrepancies in timing, but there are links to other issues that he or other witnesses have testified to."

proved fatal in the *Bryant* case is of no moment in the instant case because the jury heard

Mr. Daggett's testimony that he received the bank statements when he went to his bank

after the home invasion to inquire what had been withdrawn from his account.

## CONCLUSION

Accordingly, we affirm the judgment of the Court of Special Appeals. The trial

court did not err when it admitted the CD of the ATM surveillance footage, as the CD was

properly authenticated under Md. Rule 5-901. Additionally, the trial court did not err when

it admitted the victim's bank statements as a business record, pursuant to Md. Rule 5-803(b)(6).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

23