*Radee Labeeb Prince v. State of Maryland*, No. 106, September Term, 2021. Opinion by Nazarian, J.

**CRIMINAL LAW – EVIDENCE – AUTHENTICATION AND FOUNDATION – PHOTOGRAPHS AND VIDEOS**

The testimony of a business owner was sufficient to authenticate video surveillance footage of a shooting at the business because the witness was knowledgeable about how the cameras functioned and the process of accessing and downloading the footage; the surveillance footage was taken from only one camera and there was no evidence that the footage had been edited or compiled before it was obtained by the police.

**CRIMINAL LAW – EVIDENCE – WEIGHT AND SUFFICIENCY**

The evidence was sufficient to establish that the defendant committed murder, attempted murder, and a crime of violence with a firearm even though the defendant asserted imperfect self-defense through witness testimony; it is the jury's task to assess the credibility of witnesses and in doing so, they may choose whether or not they believe the witnesses and accept their testimony.

**JURY – COURSE AND CONDUCT OF TRIAL IN GENERAL – EXAMINATION OF JUROR**

The trial court's denial of counsel's request that venirepersons answer *voir dire* questions while wearing clear face masks or unmasked during the COVID-19 pandemic was not a violation of the defendant's right to participate during *voir dire* because, under these extraordinary circumstances, masking did not hinder the parties' ability to evaluate potential jurors adequately and the court provided sufficient reasoning for denying counsel's request.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 106

September Term, 2021

_____

RADEE LABEEB PRINCE

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Nazarian,
Zic,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: October 26, 2022

* Ripken, Laura S., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Radee Labeeb Prince was found guilty and criminally responsible in the Circuit Court for Harford County for the murder of three people, the attempted murder of two others, and for committing a crime with a firearm. There is no dispute that he committed the shootings. At trial, he asserted imperfect self-defense and argued that he subjectively believed he was in imminent danger of bodily harm when he shot his victims. In this appeal, Mr. Prince challenges the trial court's decision to admit surveillance footage of the shooting, its determination that there was legally sufficient evidence to uphold Mr. Prince's convictions, and its denial of defense counsel's request that potential jurors answer *voir dire* questions while unmasked or wearing clear face masks. We affirm the judgments of the circuit court.

## I.      BACKGROUND

On the morning of October 18, 2017, Mr. Prince went to work at Advanced Granite Solutions ("AGS"), a company that manufactures and installs countertops. He worked there as a machine operator. Testimony from two victims and surveillance footage revealed that inside the shop, Mr. Prince summoned five co-workers to come closer, then he shot each of them. Three victims died from gunshot wounds: Bayarsaikhan Tudev, Enis Mrvoljak, and Oscar Hidalgo. Two other victims, Enoc Sosa and Roberto Gillen, survived the attack and testified during Mr. Prince's trial.

Mr. Sosa testified that on October 18, 2017, Mr. Prince "call[ed] all [his] friends to tell [them] to come close," then started shooting. Mr. Gillen provided similar testimony. Mr. Prince then left AGS and drove to Delaware, where he planned on confronting Jason Baul, a former friend who Mr. Prince alleges was behind an attack on Mr. Prince in 2014.

In Delaware, Mr. Prince shot Mr. Baul.[1] Ultimately, police arrested Mr. Prince while he was walking through a neighborhood in Delaware.

Mr. Prince admitted to shooting all five people at AGS but maintained that he "shot the people that [he] felt [were] an immediate threat to [him]." He testified at trial that on the morning of the shooting, he heard Mr. Hidalgo say on the phone that "we're going to beat this puto[2] n**** up." In addition to hearing this statement, Mr. Prince testified that his co-workers were "throwing things on the ground" and "banging on poles," which together, made him feel like he was about to be attacked. He explained that he asked his co-workers to gather to "see how [they] could coexist" and how they "could get through the day." But Mr. Prince testified that he then perceived a "threatening motion" from Mr. Gillen, felt threatened, and started firing his gun.

Mr. Prince's experiences and conditions leading up to the shooting also provide context for the shooting and the issues on appeal. In February 2014, Mr. Prince was assaulted and suffered a large laceration on his face, a laceration on his finger, internal injuries, and an injured back. He testified that he suffers from "emotional problems" because of the attack. Mr. Prince's girlfriend, Lakendra Harris, testified that after the attack, she saw significant changes in his behavior. According to Ms. Harris, Mr. Prince became "extremely paranoid" that "someone was trying to kill him." She also testified that Mr. Prince stopped eating and sleeping and would constantly guard the house. Mr. Prince

---

[1] Because Mr. Baul was shot in Delaware, Mr. Prince was prosecuted there in connection with that incident.

[2] "Puto" is an expletive in the Spanish language.

testified that he often felt as if he was being followed or that he was about to be attacked again. Dr. David Williamson, a forensic psychiatrist who evaluated Mr. Prince on several occasions, testified that Mr. Prince suffered from major depression with psychotic features or symptoms and that he exhibited symptoms of post-traumatic stress disorder. Dr. Williamson also found that as a result of the attack in 2014, Mr. Prince had a "moderate traumatic brain injury to the frontal lobe," the part of the brain responsible for regulating emotion and aggression. Dr. Williamson concluded "to a reasonable degree of medical or psychiatric certainty" that Mr. Prince suffered from these mental disorders at the time of the shooting.

The proceedings in this case were bifurcated. A jury trial on guilt was held from October 13-27, and on October 28, the jury found Mr. Prince guilty on all counts. From October 28 to November 2, the jury considered Mr. Prince's criminal responsibility and found him criminally responsible on all counts.

Mr. Prince filed a motion for new trial on November 16, 2020 and supplemented that motion on February 18, 2021. On March 1, 2021, the circuit court denied the motion. The court sentenced Mr. Prince on March 19, 2021 and Mr. Prince filed a timely notice of appeal.

## II. DISCUSSION

This appeal presents three issues: (1) whether surveillance footage recovered from AGS was admitted improperly; (2) whether the evidence was legally sufficient to support Mr. Prince's convictions; and (3) whether the trial court erred in denying defense counsel's request that the venire either be provided clear face masks or answer questions unmasked

3

during *voir dire*.[3] We hold that the surveillance footage was admitted properly, that the evidence was sufficient to support Mr. Prince's convictions, and that the trial court exercised its discretion properly when it denied defense counsel's request that venirepersons wear clear face masks or remain unmasked during *voir dire*.

**A.      The Circuit Court Did Not Err In Admitting The Surveillance Videotape Of The Shooting.**

Mr. Prince argues that the surveillance video from AGS was not authenticated properly before the court admitted it into evidence. He objected initially to the admission of the surveillance footage after the State elicited testimony from Ibrahim Kucuk, the owner of AGS, about how he provided police with the surveillance video and whether he recognized the copy shown to the police as Exhibit No. 1. At that point, the court instructed the State to lay more foundation for the footage before it could be admitted into evidence.

---

[3] Mr. Prince phrased his Questions Presented in his brief as follows:

1. Did the trial court err in admitting surveillance video without proper authentication?
2. Was the evidence legally sufficient to support Appellant's convictions?
3. Did the trial court err in denying Appellant's request that the jury venire wear transparent face masks during voir dire?

The State phrased its Questions Presented as follows:

1. Did the trial court properly exercise its discretion in admitting video footage of the mass shooting?
2. Was there sufficient evidence to support Prince's convictions?
3. Did the trial court properly exercise its discretion in denying [Mr.] Prince's request that the venirepersons wear clear face coverings during voir dire and jury selection?

4

In response to more questions, Mr. Kucuk stated that the video equipment was located in his office and that he, his business partner, and a "technical person in charge of the cameras and making sure they are working and connected" were the "caretaker[s]" of the video. Mr. Kucuk also testified that the cameras were used on a daily basis. Defense counsel objected again on grounds that adequate foundation had not been laid, citing *Washington v. State*, 406 Md. 642 (2008). Again, the court found that sufficient foundation had not been laid and ruled that the State needed foundation for how the equipment worked and captured images. So, the State asked Mr. Kucuk a series of additional questions about the equipment, how it worked, and how he had retrieved the video:

> [THE STATE]: Mr. Kucuk, you indicated the video equipment is in your office. How does that video equipment work? Can you explain it to the ladies and gentlemen of the jury?
>
> [MR. KUCUK]: Yes. We did—we have DVR and the recorder in my office in unit 2 and it's wired all around the building with video wires and cameras are located in each unit.
>
> [THE STATE]: Now, does someone have to physically turn the video equipment on or is it constantly running?
>
> [MR. KUCUK]: It's constantly running.
>
> [THE STATE]: And you indicated that you have a DVR and video equipment in your office. Does that automatically record what's captured on the cameras?
>
> [MR. KUCUK]: Yes. It automatically records.
>
> [THE STATE]: And then in order for you to access that video, how is that done?
>
> [MR. KUCUK]: I would need to go in my office or I turn on my cell phone and I could access from my cell phone. . . .
>
> [THE STATE]: And on October 18th of 2017, when the police

5

were at your shop did you physically download the video for the officer?

[MR. KUCUK]: I went into the office and physically showed them how to access the video and the past of it.

[THE STATE]: And did you stay in the office while the officers did that?

[MR. KUCUK]: Yes, I did.

[THE STATE]: And did you see them take a recording of it and did you watch any of that that they took?

[MR. KUCUK]: I watched the video.

[THE STATE]: And what I've shown you in State's Exhibit No. 1, although a portion of it, is that the video that you provided to the police on October 18th of 2017?

[MR. KUCUK]: That's the video.

* * *

[THE STATE]: Has that video been changed in any way based on what you have seen?

[MR. KUCUK]: No. It couldn't be.

The defense continued to object to the video's foundation, but the court overruled the objection and admitted the surveillance video into evidence.

In this Court, Mr. Prince argues that none of the foundational elements for authentication were present. He argues that "[e]ven the minimal information the court itself stated was a prerequisite for admissibility was lacking" and that "the only information about how the video got into the hands of the police was [Mr.] Kucuk's testimony that he 'physically showed them how to access' the equipment." He lists a series of "foundational elements" that, he asserts, were missing from the testimony, including "the method used

6

by police to access the video, the equipment used to access the video, . . . the general reliability of the surveillance systems, their maintenance history" and so on. And the error in admitting the video wasn't harmless, he contends, because portions of the video were played several times for the jury and the State "relied heavily" on the surveillance footage during closing arguments.

The State responds that the surveillance footage was authenticated properly since Mr. Kucuk was "an owner of AGS and the business's records custodian." Citing the "silent witness" theory of authentication, the State argues that the footage was authenticated properly because "[Mr.] Kucuk testified to the general reliability of the recording system, the accuracy of the exhibit, and the equipment that was used to produce it." Though the State didn't elicit testimony about the reliability of the recording system and the equipment used to produce the video, we find nevertheless that the State laid a foundation sufficient to authenticate the surveillance footage.

This Court must determine whether the trial court abused its discretion in finding that the surveillance footage was properly authenticated before admitting it into evidence. *Donati v. State*, 215 Md. App. 686, 708 (2011). A trial court abuses its discretion when "no reasonable person would take the view adopted by the trial court," or when the ruling is "clearly against the logic and effect of facts and inferences before the court." *King v. State*, 407 Md. 682, 697 (2009) (cleaned up).

Under Maryland Rule 5-901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Because photos and videos

7

can be manipulated, "[c]ourts . . . require authentication of photographs, movies, or videotapes as a preliminary fact determination, requiring the presentation of evidence sufficient to show that the evidence sought to be admitted is genuine." *Washington*, 406 Md. at 651–52. The admissibility requirements for videotapes are the same as the requirements for photographs. *Id.* at 651. Photographs and videotapes may be authenticated either of two ways: through the pictorial testimony theory of authentication or the "silent witness" theory of authentication. On the one hand, "the pictorial testimony theory of authentication allows photographic evidence to be authenticated through the testimony of a witness with personal knowledge"; on the other, the "silent witness" theory "authenticates a photograph as a mute or silent independent photographic witness because the photograph speaks with its own probative effect." *Id.* at 652 (cleaned up). Under the "silent witness" theory, then, a party can authenticate video evidence through "presentation of evidence describing a process or system that produces an accurate result." *Id.* Maryland courts have not adopted "'any rigid, fixed foundational requirements' for admission of evidence under the 'silent witness' theory" of authentication. *Jackson v. State*, 460 Md. 107, 117 (2018) (*quoting Dep't of Pub. Safety & Corr. Servs. v. Cole*, 342 Md. 12, 26 (1996)).

In this case, the State established that Mr. Kucuk was one of the "caretaker[s]" of the surveillance footage. Mr. Kucuk testified that the cameras were used on a daily basis and that they automatically recorded what they captured. He explained that the cameras did not need to be turned on and that they were running constantly; he was able to access the live feed from the cameras on his cellphone but needed to be in his office to access recorded footage. Although Mr. Kucuk did not access and download the recorded footage

8

for the police himself, he knew the process and was able to show the officers how to do it while he was present. Mr. Kucuk also watched the video that the police officers downloaded and was able to identify State's Exhibit No. 1 as the same surveillance footage. Moreover, there was no evidence that the cameras were not working properly or that the video had been altered. The State's foundation authenticated the surveillance footage sufficiently before it was admitted into evidence.

Mr. Prince relies heavily on *Washington v. State* in arguing that the State's foundation was insufficient. In *Washington*, the State introduced surveillance footage of a shooting that occurred outside of a bar during the direct examination of the bar's owner, Mr. Kim. 406 Md. at 646. The footage was "compiled from the various cameras and was transferred to a VHS tape" by a technician, a process unknown to Mr. Kim. *Id.* The State relied on the "silent witness" theory of authentication and the trial court admitted the tape into evidence over defense counsel's objection. *Id.* at 646–47. The Court of Appeals held that there was insufficient foundation as to "the process used, the manner of operation of the cameras, the reliability or authenticity of the images, or the chain of custody of the pictures." *Id.* at 655. Because the recording was "made from eight surveillance cameras, was created by some unknown person, who through some unknown process, compiled images from the various cameras to a CD," the Court held that the foundation was insufficient. *Id.*

But unlike Mr. Kim in *Washington*, Mr. Kucuk knew the process by which the police could obtain the video. The circuit court found, and we agree, that Mr. Kucuk was knowledgeable about the process of obtaining the surveillance footage and provided

9

sufficient foundation to admit the footage. The surveillance video admitted in this case consisted of footage from the viewpoint of one camera; although the system involved 16 cameras, there is no evidence that the footage was "compiled from the various cameras." *Compare id.* at 646. The surveillance footage here took the form of a "simple videotape" and required a less detailed foundation than the more complicated footage at issue in *Washington. Id.* at 655. Given that "[t]he threshold of admissibility is . . . slight," *Jackson*, 460 Md. at 116, and that the tape did not undergo any editing before being viewed by the police and used during trial, we find that the State laid a sufficient foundation and that the court did not abuse its discretion in admitting the surveillance tape into evidence.

**B.** **There Was Legally Sufficient Evidence To Support Mr. Prince's Convictions.**

At the close of the State's case, Mr. Prince moved for judgment of acquittal on all counts. The court denied the motion. The defense renewed the motion at the close of evidence and the court denied it again. On appeal, Mr. Prince argues that the evidence was insufficient to support his convictions because Mr. Prince offered evidence that he acted in self-defense. As he put it in his brief, "[w]hen a defendant offers some evidence that he acted in self-defense or defense of others—whether it be perfect or imperfect—the burden shifts to the State to prove beyond a reasonable doubt that the defendant did not do so." Mr. Prince contends that the 2014 assault resulting in his mental disorders, the "incessant harassment by his co-workers," the sudden movement he perceived as an imminent threat before firing the gun, and the expert witness testimony that Mr. Prince's mental health condition was consistent with his claim of self-defense all demonstrated that "[Mr. Prince]

10

*actually and honestly* believed he was in mortal danger when he shot the victims." The evidence was legally insufficient to support the convictions of murder, attempted murder, and use of a firearm in the commission of a crime of violence, Mr. Prince argues, because the State did not meet its burden of proving that he didn't act in self-defense.

In response, the State argued that the evidence was legally sufficient to support the convictions. There was no dispute that Mr. Prince brought a pistol to work, and that the surveillance footage showed him summoning his co-workers to come closer, then shooting them. Mr. Prince admitted to writing to his girlfriend, "If I don't make it home, please know that I tried." As for Mr. Prince's self-defense claim, the State contends that "the jury did not need to credit any part of [Mr.] Prince's testimony or evidence that supported his view of the facts." According to the State, the jury could have found that Mr. Prince's testimony wasn't credible and in favor of the "evidence supporting findings that [Mr.] Prince pre-planned the shooting and was the sole aggressor."

When reviewing the sufficiency of evidence to support a criminal conviction, the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (emphasis added). "[C]ircumstantial evidence alone can provide a sufficient basis upon which a trier of fact can rest its determination of guilt . . . ." *Pinkney v. State*, 151 Md. App. 311, 329 (2003). Due to the fact-finder's unique position in observing the testimony and credibility of the witnesses in real-time, we won't "re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Tracy v. State*, 423 Md. 1, 12 (2011). Instead, "[w]e defer

11

to the jury's inferences and determine whether they are supported by the evidence." *Smith v. State*, 415 Md. 174, 185 (2010).

Mr. Prince was convicted of murder, attempted murder, and commission of a crime of violence with a firearm, so we'll examine each in turn.[4]

### 1. Murder and attempted murder

To sustain a conviction of first-degree murder, the State had to prove that the killing was "deliberate, premeditated, and willful . . . ." Md. Code (2002, 2021 Repl. Vol.), § 2-201 of the Criminal Law Article. The Court of Appeals in *Tichnell v. State* defined "deliberate, premeditated, and willful" succinctly:

> For a killing to be "willful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate.

287 Md. 695, 717 (1980). Mr. Prince was also convicted of attempted first-degree murder, which consists of "the intent to commit the offense and some overt act towards its commission." *Bruce v. State*, 317 Md. 642, 646 (1989).

Among the evidence presented at trial, the State produced surveillance footage and eyewitness testimony showing Mr. Prince summoning five of his co-workers to come closer, pulling out a handgun, and shooting each of them. The State also produced evidence that the gun used by Mr. Prince in this shooting was found later in Delaware, where Mr.

---

[4] Mr. Prince was also convicted of possession of a regulated firearm after being convicted of a disqualifying crime, but he isn't challenging that conviction here.

Prince traveled, completed another shooting, and ultimately was arrested. The record revealed that after the shooting, police found a note written by Mr. Prince in his home that read: "If I don't make it home, please know that I tried." The jury readily could have concluded beyond a reasonable doubt that Mr. Prince brought a gun to work and shot his victims willfully and deliberately, with the purpose of killing them, and that he killed three of them and wounded the other two.

### 2. *Commission of a crime of violence with a firearm*

"A person may not use a firearm in the commission of a crime of violence," and the list of crimes includes, among others, first- and second-degree murder. CR § 4-204(b); *see* Md. Code (2003, 2018 Repl. Vol.), § 5-101(c) of the Public Safety Article (defining "crime of violence"). Because there was legally sufficient evidence for a jury to find that Mr. Prince committed first-degree murder with a firearm, there is sufficient evidence on the record to uphold a conviction for committing that same crime of violence with a firearm.

### 3. *Self-defense*

Mr. Prince contends that because he produced evidence that his conduct qualified as imperfect self-defense, the State failed to meet its burden to prove that Mr. Prince didn't act in self-defense, and thus, that the evidence is insufficient to support his convictions. We disagree.

Maryland law recognizes two forms of self-defense: perfect and imperfect. *Porter v. State*, 455 Md. 220, 234 (2017). Perfect self-defense requires an objectively reasonable

belief that the accused faced imminent or immediate danger of death or serious bodily harm:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Id.* at 234–35 (*quoting State v. Smullen*, 380 Md. 233, 252 (2004)).

There are three key differences between perfect self-defense and imperfect self-defense. *First*, for an imperfect self-defense, the defendant need "only show that he actually believed that he was in danger, even if that belief was unreasonable." *Id.* at 235. *Next*, the defendant is required only to prove that "he actually believed the amount of forced used was necessary," and his belief doesn't have to be reasonable. *Id. Finally*, "a defendant must have only 'subjectively believe[d] that retreat was not safe'—that belief need not be reasonable." *Id.* (*quoting Burch v. State,* 346 Md. 253, 284 (1997)). Imperfect self-defense is not a complete defense against criminal charges, though—an imperfect defense negates the malice requirement and mitigates murder to voluntary manslaughter. *State v. Faulkner*, 301 Md. 482, 486 (1984).

In this case, Mr. Prince relied on his own testimony and expert witness testimony from Dr. David Williamson to provide "some" evidence of an imperfect self-defense, and

14

that evidence was sufficient to submit the issue to the jury. *See Porter*, 455 Md. at 240 ("[T]he defendant has the burden of initially producing 'some evidence' on the issue of mitigation or self-defense" before the jury can receive an instruction on the elements of self-defense) (cleaned up). But it is up to the jury, not the court, to determine whether they believe the witnesses. *See Calloway v. State*, 414 Md. 616, 635 (2010) (the jury, as the trier of fact, is responsible for "resolving credibility issues"); *Dawson v. State*, 329 Md. 275, 281 (1993) ("[I]t is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses."). And on this record, Mr. Prince's sufficiency argument "amount[s] to nothing more than taking issue with the weight and credibility determinations made by the jury." *Correll v. State*, 215 Md. App. 483, 501–02 (2013). The jury, the fact-finder tasked with determining the credibility of witness testimony at trial, was free to believe Mr. Prince and his witnesses or not, and if they didn't, his imperfect self-defense claim necessarily would fail. On this record, the evidence before the circuit court was legally sufficient to support his convictions and the jury's rejection of his self-defense theory.

### C. The Trial Court Did Not Err In Denying Defense Counsel's Request That The Venire Be Provided Clear Face Masks Or Answer Questions Unmasked During *Voir Dire*.

At the time of jury selection and trial in this case, everyone in Maryland's courthouses was required to wear face masks to prevent the contraction and transmission of COVID-19. *See* Second Administrative Order Clarifying COVID-19 Health Measures

in Courthouses and Judicial Branch Facilities (Md. Ct. App. Oct. 2, 2020).[5] During jury selection, Mr. Prince asked the trial court to require prospective jurors either to wear a clear mask or to answer *voir dire* questions unmasked. Defense counsel objected to the court's direction that potential jurors keep their face masks on during *voir dire*:

> Well, the defense does have an objection when we are unable to see fifty percent of an individual's face. With the understanding that we are in the pandemic and I know that there are some measures to prevent the spread of the coronavirus, but studies have shown that 55 percent of communication is non-verbal. The defense cannot see in essence 55 percent of an individual's face. So, the defense is not receiving greater than half of the communication.

> The defense would like to note an objection to any [venire] person actually wearing a mask. If they have a clear [mask on], we have no problem with that.

In overruling defense counsel's request, the court reasoned that the parties would be able to see the eyes and expressions of potential jurors and to assess potential biases:

> While I understand your desire to have the jurors remove their mask and I have contemplated that that would occur, an Administrative Order was issued most recently by Chief Judge Barbera and that Administrative Order is very clear that masks had to be worn at all times and that the only time that masks could be removed, even in the proceedings, and if the juror had a personal shield or a clear facemask. It is impossible for the Court to accommodate every single juror with their facemask or a personal shield. So, that can't happen here. Because of that Administrative Order, I cannot direct a juror to lower their mask.

> Now, I know you indicated 55 percent is body language. I don't

---

[5] This administrative order is available at: https://mdcourts.gov/sites/default/files/admin-orders-archive/20201002secondorderclarifyingCOVID19healthmeasuresincourthousesandjudicialbranchfacilities.pdf (last visited October 20, 2022), *archived at* https://perma.cc/3LM8-XYZD.

16

know what study that is.[6] What I do know is to determine whether an individual is biased or disqualified from jury service it is what the juror says pertaining to the questions. While I recognize that sometimes body language may dictate some hesitation, often times it is the body language and not necessarily a facial expression. I believe that we will be able to see the eyes of the jurors and from part of their nose up and that you will be able to gauge whether or not their responses would suggest that they have a bias and should be disqualified. So, while I recognize that you're noting the objection, I am working in accordance with what has been directed to me.

Mr. Prince argues here that "the trial court denied him vital information in selecting the jurors who would serve on his panel" in violation of his Sixth Amendment right to be present and participate in *voir dire*. The State counters that the masks didn't prevent Mr. Prince from evaluating potential jurors and that the trial court exercised its discretion properly when it denied the defense's request.

We must determine whether the trial court abused its discretion during *voir dire* when it denied defense counsel's request to provide all venirepersons with clear face masks. *Collins v. State*, 452 Md. 614, 623 (2017). A criminal defendant has the right to participate in *voir dire*. *See* U.S. CONST. amend. VI; Md. Decl. of Rts., art. 21; Md. Rule 4-231; *Bedford v. State*, 317 Md. 659, 670 (1989). This right includes not only the right "to be present during *voir dire*, but also to have adequate opportunity to gain a good perception of the potential jurors." *Id.* at 673. Because there are no specific instructions for how *voir*

---

[6] Defense counsel later explained that the study was from the American Bar Association.

*dire* must be conducted, "the nature and extent of the procedure lies solely within the sound discretion of the trial judge." *Id.* at 670.

The cases cited by Mr. Prince all highlight, correctly, the importance of ensuring that a defendant has an adequate opportunity to examine potential jurors before they are selected. *See id.* at 673 (Defendants "should be given the opportunity to read the faces of his jurors" and "be afforded every opportunity to 'size up' his jury . . . so as to assist counsel in determining which jurors should be disqualified for cause or even for no cause at all."); *State v. Yancey*, 442 Md. 616, 625 (2015) ("[A] defendant has the right to be physically present during all critical stages of trial, including at voir dire proceedings, which includes the substantial right of the prisoner to be brought *face to face* with the jurors at the time when the challenges are made.") (cleaned up); *Lewis v. United States*, 146 U.S. 370, 376 (1892) (emphasizing the importance of being "sensible [to] sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" when selecting a jury). All the same, we don't read the words "face-to-face" literally to require the court to conduct *voir dire* with unmasked faces (and, more to the point, noses and mouths) during a global pandemic. The phrases "face-to-face" and "read the faces of his jurors" reinforce the basic requirement that the defendant must be able to see and hear potential jurors when they answer questions, not to impart constitutional significance to the ability to view a potential juror's entire face. Although we acknowledge that an individual's facial expressions play a role in nonverbal communication, it was not unreasonable for the court to observe the constraints posed by the COVID-19 pandemic and the paramount importance of public health and safety.

Nor does Mr. Prince argue, or the record in any way suggest, that he in fact was denied an opportunity to see, hear, and evaluate the potential biases of members of the panel during jury selection. The only issue defense counsel raised was that the potential jurors would be masked while answering questions, but they were masked for all parties and the court, and the marginal diminution of everyone's ability to see the lower halves of the potential jurors' faces didn't affect the answers they gave or the court's ability to evaluate and rule on motions to exclude them. The trial judge gave an "articulated and legally sufficient reason" for overruling defense counsel's objection to potential jurors wearing opaque masks during *voir dire*, and we find that the court, under the extraordinary public health circumstances, did not abuse its discretion by observing the Judiciary's COVID protocols during jury selection in this case. *Bedford*, 317 Md. at 375.

**JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**